## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **BEREAN CHRISTIAN STORES, LLC**<br>**9415 Meridian Way**<br>**West Chester, OH 45069** | **Case No. 09-13640** |
| **a Delaware limited liability company,** | **Honorable Jeffery P. Hopkins** |
| **Debtor** | |
| **Employer Tax I.D. No. 20-4890647** | |

**DEBTOR'S MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363, 365, 1107 AND 1108 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 (A) APPROVING PROCEDURES FOR CONSIDERATION OF ALTERNATIVE INVESTMENT OR SALE PROPOSALS; (B) APPROVING THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO APPROVE THE TRANSACTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND/OR ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS**

The above-captioned debtor (the "Debtor" or the "Company"), hereby moves for the entry of an order (A) approving procedures for the sale of the Debtor's assets, (B) approving the proposed break-up fee and expense reimbursement, (C) scheduling an auction and hearing to approve the transaction and the form and manner of notice thereof, and (D) establishing procedures relating to the assumption and/or assignment of executory contracts and unexpired leases and the form and manner of the proposed notice of cure amounts (the "Motion"). In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.      The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and by Rules 2002(a)(2), 6004, 6006(a), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

3.      By this Motion, the Debtor seeks entry of an order (A) approving procedures for the sale of the Debtor's assets, (B) approving the proposed break-up fee and expense reimbursement, (C) scheduling an auction and hearing to approve the transaction and the form and manner of notice thereof, (D) establishing procedures relating to the assumption and/or assignment of executory contracts and unexpired leases and the form and manner of the proposed notice of cure amounts, and (E) granting related relief.

## BACKGROUND

4.      The Debtor commenced this case by the filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 9, 2009 (the "Commencement Date"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its affairs as debtor-in-possession. As of the date hereof, no creditors committee, trustee or examiner has been appointed in this chapter 11 case.

5.      The Debtor is a regional chain of 19 Christian bookstores based out of the Cincinnati, Ohio area. The Debtor's stores are located in seven states throughout the United States. In addition, the Debtor operates an online site for additional retail sales. The Debtor offers a large assortment of

biblically-based products in an easy to shop environment. Stores feature Christian books, Bibles, music, gifts, home décor, jewelry, cards, apparel, church supplies and curriculum. Products unavailable in the stores may be special ordered to meet the Christian resource needs of customers.

6. The Debtor has entered into an asset purchase agreement with Berean Christian Stores Endeavor, LLC, a California limited liability company (the "Purchaser"), in connection with a comprehensive financial restructuring of the Debtor. The proposed restructuring includes a debtor-in-possession loan facility provided by an affiliate of BCSE, SANI PACIFIC, a California corporation ("SANI" or the "Lender") (the "Financing Agreement") and contemplates that BCSE would purchase substantially all of the Debtor's assets, subject to an auction process and the receipt of higher and better bids.

7. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to this chapter 11 filing are contained in the Declaration of David William Simmons III in Support of First Day Motions and Applications (the "Simmons Declaration"), filed June 9, 2009 (Doc. No. 19.).

### PRELIMINARY STATEMENT

8. The Debtor and the Purchaser have negotiated a purchase agreement (the "Purchase Agreement", a copy of which is attached hereto as <u>Exhibit A</u>) whereby the Purchaser will seek to purchase all or substantially all of the Debtor's assets, pursuant to a sale under section 363 of the Bankruptcy Code. In order to provide the maximum return to the Debtor's estate and the Debtor's creditors, the Purchase Agreement and the transaction contemplated thereby (the "Transaction") is subject to higher and better offers.

### BID PROTECTIONS

9. The Purchase Agreement contemplates reasonable and fair bid protections, in the form of a Break-Up Fee and Expense Reimbursement, in the event the Purchaser is not the

Prevailing Purchaser (each as defined below), as well as the imposition of an Initial Overbid (as defined below). Such protections are to be provided in recognition of the Purchaser's expenditure of time, energy and resources, and the benefits to the Debtor's estate of securing the Purchase Agreement and the guaranteed minimum bid it establishes in the event of an Auction (as defined below). The Debtor submits that if it is not able to provide such protections to the Purchaser, the Purchaser will no longer be bound by the Purchase Agreement and may not continue to pursue the proposed sale transaction with the Debtor.

10.     By this Motion, the Debtor seeks authority to be able to award and, if required, pay a break-up fee in an amount of $50,000, (the "Break-Up Fee") if, among other things, the Debtor's assets, or a substantial amount of the Debtor's assets are sold to a third party or group of parties unaffiliated with the Purchaser.

11.     In addition to payment of the Break-Up Fee, the Debtor seeks to reimburse the Purchaser for its reasonable expenses incurred in connection with its diligence as well as the formation, negotiation and documentation of the Purchase Agreement (including legal, accounting, and other consultant fees and expenses) and to fund reasonable expenses the Purchaser incurs with respect to obtaining financing and its participation in the sale process, up to a cap of $50,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections").

12.     Furthermore, in order for a Qualifying Bidder (as defined below) to submit a Qualifying Bid, such bid must include an initial overbid, which is inclusive of the Break-Up Fee and Expense Reimbursement, of at least $160,000 (the "Initial Overbid")

13.     It is understood by the Debtor that in entering into the Purchase Agreement, the Purchaser has provided a material benefit to the Debtor, its creditors and the estate by increasing the likelihood that the best possible price for the Debtor's assets will be received.  The Bid Protections

have induced the Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors and other bidders may rely. Accordingly, the Debtor represents that the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate and should be approved by this Court.

## AUCTION PROCESS

### A.   PROPOSED TRANSACTION

14.     In order to (a) allow any person that wishes to participate in the bid process (each a "Potential Bidder") the opportunity to submit a bid that is higher and better than the bid set forth in the Purchase Agreement, (b) insure that the Debtor has the opportunity to consider all reasonable offers, and (c) select the highest or best of such offers, the Debtor proposes a two-phase auction process as set forth in detail on the attached Exhibit B (the "Bid Procedures").

15.     The first phase would require the solicitation of bids from Qualifying Bidders for all or substantially all of the property and assets of the Debtor's business (an "Asset Sale" and the property and assets purchased pursuant thereto, the "Acquired Property"). Assuming the Debtor receives at least one Qualifying Bid (as defined below) from a Qualifying Bidder, in addition to the Purchase Agreement from the Purchaser, the second phase would require a formal auction (the "Auction") of the Debtor's assets.

16.     The Debtor is proposing the Bid Procedures as the procedures most likely to maximize value for the benefit of the Debtor's estate, creditors and other parties in interest. As described below, and more fully in the Bid Procedures, only Qualified Bidders who timely submit a Qualified Bid are eligible to participate in the Auction.

### B.   QUALIFYING BIDDERS

17.     To participate in the bid process, a Potential Bidder must become a "Qualifying Bidder." Except as otherwise permitted by the Debtor, as a prerequisite to becoming a Qualifying

Bidder (and, thus, being able to conduct due diligence), a Potential Bidder must be able, as determined by the Debtor, in consultation with its advisors, to consummate a transaction based upon the Asset Sale, if selected as the successful bidder.

18.     The Purchaser is deemed to be a Qualifying Bidder and the Purchase Agreement constitutes a Qualifying Bid for all purposes.

19.     Due Diligence:  The Debtor shall afford any Qualifying Bidder that delivers an executed confidentiality agreement in form and substance acceptable to the Debtor, the time and opportunity to conduct reasonable due diligence, subject to parameters that the Debtor, in consultation with its advisors, deems appropriate.  The due diligence period shall extend through and include the Bid Deadline (as defined below).  The Debtor requests that neither it nor its representatives be obligated to furnish any due diligence information after the Bid Deadline.

### C.     BID REQUIREMENTS AND AUCTION PROCESS

20.     Once Potential Bidders are determined to be Qualifying Bidders, they shall be entitled to participate in the bid and Auction process.  The Bid Procedures provide in relevant part as follows:

A.     Bid Requirements:     To be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder by a date no later than the Bid Deadline that:

(1)     states such Qualifying Bidder offers to purchase all or substantially all of the assets of the Debtor, (the "Assets") upon the terms and conditions substantially as set forth in the Purchase Agreement or pursuant to an alternative structure that the Debtor determines is no less favorable than the terms and conditions of the Purchase Agreement;

(2)     is accompanied by a clean and duly executed purchase agreement (the "Modified Purchase Agreement") and a marked Modified Purchase Agreement reflecting any variations from the Purchase Agreement executed by the Purchaser;

(3)     states such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement and, provides written evidence in support thereof;

(4)     states such Qualifying Bidder's offer is irrevocable until the closing of the Asset Sale if such Qualifying Bidder is the Prevailing Purchaser or Back-Up Bid (each as defined below);

(5)     contains such financial and other information to allow the Debtor, in consultation with its advisors, to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including, without limitation, such financial and other information setting forth adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code in a form requested by the Debtor;

(6)     identifies with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;

(7)     does not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement, or similar type of payment;

(8)     fully discloses the identity of each entity that will be bidding in the Asset Sale or otherwise participating in connection with such bid (including the parent company of any entity formed to participate in the Asset Sale), and the complete terms of any such participation;

(9)     will result in value to the Debtor's estate, in the Debtor's reasonable judgment after consulting with legal and financial advisors, that is more than the aggregate of the value of the sum of: (i) $1,600,000 (the initial purchase price) plus (ii) $160,000, the Initial Overbid (inclusive of the Bid Protections);

(10)    provides for the repayment of all obligations owed by the Debtor under the Financing Agreement by the date upon which the transaction contemplated under the Modified Purchase Agreement is substantially consummated;

(11)    (i) does not contain any due diligence or financing contingencies of any kind; and (ii) contains evidence that the Qualifying Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to consummate the Asset Sale, which evidence is reasonably satisfactory to the Debtor;

(12)    includes evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Purchase Agreement; and

(13)    provides a purchase deposit equal to ten percent (10%) of the purchase price contained in the Modified Purchase Agreement.

A competing bid satisfying all the above requirements shall constitute a Qualifying Bid.

B.    Bid Deadline

A Qualifying Bidder that desires to make a bid shall deliver a written or electronic copy of its bid to (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons) and (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor so as to be received no later than July 16, 2009 at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline").

C.    Evaluation of Qualifying Bids

The Debtor shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be qualified by a date no later one (1) day prior to the Auction Date (as defined below).  Prior to the Auction (as defined below), the Debtor shall determine, in its reasonable judgment, which of the Qualifying Bids is the highest or best value to the Debtor.  Upon making a determination that a bidder has submitted a Qualifying Bid, the Debtor shall promptly notify the purchaser of the identity of the proposed Qualifying bidder and provide the Purchaser with a copy of the Qualifying Bid.

D.    No Qualifying Bids

If no timely, conforming Qualifying Bids other than the Purchase Agreement submitted by the Purchaser are submitted by the Bid Deadline, the Debtor shall not hold an Auction and instead shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the Purchase Agreement with the Purchaser.

E.    Auction

In the event that the Debtor timely receives one or more Qualifying Bids other than the Purchase Agreement, the Debtor shall conduct an auction (the "Auction") on a date and at a location to be determined by the Debtor, which shall occur no later than July 22, 2009 (the "Auction Date").  The Auction shall be governed by the following procedures:

(a)    only the Purchaser and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(b)    the Purchaser and the other Qualifying Bidders shall appear in person or by other means, including telephonically, as may be permitted by the Debtor at the Auction, or through a duly authorized representative;

(c)    bid shall commence at the amount of the highest Qualifying Bid submitted by a Qualifying Bidder prior to the Auction;

(d)    Qualifying Bidders may then submit successive bids in minimum increments, to be determined in the sole discretion of the Debtor, and then continue in such increments;

provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(e)    the Purchaser shall be entitled to include as part of any and all of its subsequent bids a credit for the amount of the Break-Up Fee and the Expense Reimbursement (each as defined in the Purchase Agreement);

(f)    all Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction, provided that any such modifications to the Purchase Agreement or Modified Purchase Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtor than the terms of the Purchase Agreement;

(g)    the Auction shall continue until there is only one offer that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best from among the Qualifying Bids submitted at the Auction (the "Prevailing Bid"); and the second highest or best from among the Qualifying Bids submitted at the Auction, as determined by the Debtor, shall be the "Back-Up Bid".  In making this decision, the Debtor shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate.  The bidder submitting such Prevailing Bid shall become the "Prevailing Purchaser," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Purchase Agreement or Modified Purchase Agreement, as applicable.  The bidder submitting such Back-Up Bid shall become the Back-Up Bidder and in the event the Prevailing Purchaser fails to close shall be required to close under the terms of the Purchase Agreement or Modified Purchase Agreement signed by such Back-Up Bidder;

(h)    within one (1) business day after adjournment of the Auction, the Prevailing Purchaser shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made; and

(i)    within one (1) day after adjournment of the Auction, the Debtor shall file a notice identifying the Prevailing Purchaser and Back-Up Bidder with the Bankruptcy Court.

F.    <u>Sale Hearing</u>

The Prevailing Bid (or the Purchase Agreement if no Qualifying Bid other than that of the Purchaser is received) and Back-Up Bid will be subject to approval by the Bankruptcy Court. The hearing to approve the Prevailing Bid (or the Purchase Agreement if no Qualifying Bid other than that of the Purchaser is received) (the "Sale Hearing") shall take place on or before July 27, 2009.

G.    The Back-Up Bid

In the event the Prevailing Purchaser is unable to consummate the Asset Sale following the Sale Hearing, the Debtor will have the right to present any other bid, including the Back-Up Bid, to the Court for approval.

H.    Return of Deposits

All deposits shall be returned to each bidder not selected by the Debtor as the Prevailing Purchaser or Back-Up Bidder by no later than five (5) business days following the conclusion of the Auction.  The Deposit to the Prevailing Purchaser or Back-Up Bidder shall be returned to the party that does not close the transaction, if due and owing, no later than five (5) business days following the closing of the Asset Sale.

I.    Reservation of Rights

The Debtor reserves the right to extend the deadlines set forth in the Bid Procedures and/ or to adjourn the Auction, for cause shown, upon notice and with the consent of the Purchaser.

## D.    NOTICE OF AUCTION AND TRANSACTION APPROVAL HEARING

21.    Not later than five (5) business days after entry of an order approving this Motion, the Debtor will serve a copy of the Notice of Auction and Transaction Approval Hearing, substantially in the form attached hereto as Exhibit C (the "Sale Notice"), by first-class mail to:  (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com) and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the DIP Lender and Purchaser; (iv) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (v)  any governmental unit listed in LBR 5003-1(d); (vi) all creditors; (vii) all equity security holders; and (viii) all Potential Bidders known to the Debtor

22.     The Debtor may, but is not required to, publish a notice of sale in any publication the Debtor and its advisors determine will promote the marketing of the proposed Transaction.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

23.     To facilitate and effect the sale of assets, the Prevailing Purchaser may request that the Debtor either assume and assign or reject certain executory contracts and unexpired leases (the "Contracts").

24.     No later than ten (10) days prior to the Sale Hearing, the Debtor shall cause notice to be provided to all counterparties to executory contracts and unexpired leases informing them whether their respective Contract will be assumed and assigned (an "Assumed Contract") or rejected (the "Rejected Contract" and, together with the Assumed Contract, the "Assumed or Rejected Contracts") (the "Notice of Assumption or Rejection"), substantially in the form attached hereto as Exhibit D.  The Notice of Assumption or Rejection shall provide the counterparties to the possible Assumed Contracts notice of the amount that the Debtor believes must be cured upon the assumption and/or assignment as required by section 365 of the Bankruptcy Code (the "Cure Amount").

25.     Except as may otherwise be agreed to by the parties to an Assumed Contract (with the consent of the Prevailing Purchaser), within one (1) business day following the Closing Date, the Debtor shall pay the Cure Amounts.  In the event of a dispute regarding the Cure Amount, any payments required, following entry of a Final Order resolving such dispute, shall be made as soon as practicable thereafter.

26.     Objections, if any, to the proposed rejection or assumption and assignment of the Assumed or Rejected Contracts, including, but not limited to, objections relating to the Cure Amount and/or adequate assurances of future performance, must (a) be in writing; (b) state with specificity the nature of such objection and the alleged Cure Amount (with appropriate documentation in support thereof); (c) comply with the Federal Rules of Bankruptcy Procedure and the Local

Bankruptcy Rules of this Court; and (d) be filed with the Court and served upon (so as to be received by) the following parties (collectively, the "Notice Parties") on or before the Sale Objection Deadline (defined below): (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com) and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the DIP Term Lender and Proposed Buyer; (iv) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (v) holders of the 25 largest unsecured claims; (vi) any governmental unit listed in LBR 5003-1(d); and (vii) any other party that files a Notice of Appearance in this Chapter 11 Case.

27. Any party to an Assumed or Rejected Contract failing to timely file an objection to the Cure Amounts as set forth in the Cure Notice, or to the proposed rejection or assumption and assignment of the Assumed or Rejected Contracts, shall be forever barred from objecting to the rejection of the Assumed or Rejected Contract or the Cure Amounts and from asserting any additional cure or other amounts against the Debtor, its estate, the Prevailing Purchaser, or Back-Up Bidder with respect to such party's executory contract(s) or unexpired lease(s) and will be deemed to consent to the Transaction and the proposed rejection or assumption and assignment of its executory contract(s) or unexpired lease(s).

28. When a party to a possible Assumed Contract files a timely objection asserting a higher cure amount than the Cure Amount, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code

with respect to such objection will be determined at the Sale Hearing or such other date and time as may be fixed by the Court. All other objections to the proposed rejection or assumption and assignment of the Assumed or Rejected Contracts shall be heard at the Sale Hearing.

## BASIS FOR RELIEF REQUESTED

A.    **Bid Procedures and Bid Protections**

    **(i)**    **The Bid Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

29.    The Bid Procedures proposed herein are designed to maximize the value received for the Debtor's assets by facilitating a competitive bid process in which all Potential Bidders are encouraged to participate and submit competing bids. The Bid Procedures provide Potential Bidders with sufficient notice and an opportunity to acquire the information necessary to submit a timely and informed bid. At the same time, the Bid Procedures provide the Debtor with the opportunity to consider all competing offers and to select the highest or best offer for the completion of an Asset Sale. Moreover, by entering into the Purchase Agreement with the Purchaser, the Debtor has insured fair value by setting a minimum purchase price and testing the price in the marketplace, while at the same time, providing the best process to ensure maximum return to the Debtor's estate and creditors. Accordingly, the Debtor and all parties in interest can be assured that the consideration paid for the Debtor's assets will be fair, reasonable, and in the best interest of the Debtor's estate and creditors, and there are sound business reasons to approve the Bid Procedures.

**(ii) The Break-up Fee and Expense Reimbursement are Reasonable and Appropriate.**

30.     Approval of the Bid Protections is governed by standards for determining the appropriateness of Bid Protections in the bankruptcy context, as established by the Third Circuit in Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (hereinafter, "O'Brien"). In O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees. . . Depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535.

31.     The Sixth Circuit has used a two-part test to determine whether a claim is entitled to status as a general administrative expense.  First, the claim must arise from a transaction with the bankruptcy estate.  Second, it must directly and substantially benefit the estate.  Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 816 (6th Cir. 1997).

32.     The Third Circuit identified at least two instances in which bid incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bid, such as by inducing a bid that otherwise would not have been made and without which bid would have been limited." O'Brien, 181 F.3d at 537.  Second:

> "If the availability of break-up fees and expenses were to induce a bidder to research the value of the Debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtor is sold will reflect its true worth."

Id.

33. In <u>O'Brien</u>, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

(1)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(2)     whether the fee harms, rather than encourages, bid;

(3)     the reasonableness of the break-up fee relative to the purchase price;

(4)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(5)     the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(6)     the correlation of the fee to a maximization of value of the Debtor's estate;

(7)     the support of the principal secured creditors and creditors committees of break-up fee;

(8)     the benefits of the safeguards to the Debtor's estate; and

(9)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See <u>O'Brien</u>, 181 F.3d at 536.

34. After considering the reasonableness of bid incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case.  See <u>In re Chi-Chi's Inc.</u>, Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); <u>In re Riverstone Networks</u>, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); <u>In re Radnor Holdings</u>, Case No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); <u>In re Great Northern Paper. Inc.</u>, Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); <u>In re FSC Corp.</u>, Case No. 00-b-04659 (Bankr. N.D. Ill. February 28, 2000) (break-up fee of 3.4% plus reimbursement of expenses is reasonable).

35.     The Bid Protections should be approved because they are necessary to preserve the full value of the Debtor's estate. First, all negotiations between the Debtor, on the one hand, and the Purchaser, on the other hand, have been conducted in good-faith, and at arm's-length. The Debtor's ability to continue to shop the assets for a higher and better offer without risk of losing the Purchaser -- a "bird-in-the-hand" -- would be eliminated if the Debtor could not secure the Purchase Agreement with the Purchaser.  Therefore, because the Purchaser is not bound to continue its pursuit of an Asset Sale absent authorization of the payment of the Bid Protections, the Debtor might lose the opportunity to obtain the highest or best offer for the Debtor's assets and the downside protection that will be afforded by the Purchase Agreement.

36.     The Purchase Agreement will form the basis upon which other bids will be submitted and evaluated. The establishment of the Break-Up Fee and Expense Reimbursement permits the Debtor to insist that competing bids be higher and better than the Purchase Price under the Purchase Agreement, which is a clear benefit to the Debtor's estate. Thus, even if the Purchaser is offered the Break-Up Fee and the Expense Reimbursement and is ultimately not the Prevailing Purchaser, the Debtor will still have benefited from the higher minimum price established by the Purchase Agreement and thereby increase the likelihood that the price at which the Debtor's assets will be sold will reflect their true worth.

37.     Further, the proposed Break-Up Fee of $50,000 (approximately 3.1% of the purchase price identified in the Purchase Agreement) is reasonable.  In addition, payment of the Break-Up Fee will not harm Creditors.  The Debtor will incur the obligation to pay the Break-Up Fee only if the Debtor enters into a transaction with a Qualifying Bidder that submits a higher and better offer than the Purchase Agreement, that will result in a greater return to the Debtor's estate.  The Break-Up Fee and the Expense Reimbursement will be paid as a first priority claim from the proceeds of a

Transaction in which the Prevailing Purchaser is not the Purchaser. The Priority of the Break-Up Fee and the Expense Reimbursement will be an administrative super priority claim in this chapter 11 case and will be made prior to the payment of any other claim in this chapter 11 case, save for the obligations under the terms of any approved debtor-in-possession financing. In light of the benefit to the Debtor's estate that is realized by having entered into a Purchase Agreement prior to the hearing on this Motion, enabling the Debtor to preserve the value of the estate and promote more competitive bid, ample support exists for the approval of the Break-Up Fee and Expense Reimbursement.

### B. The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved

38.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the Debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc.. 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. PA 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a Debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case

impartially. See Richmond Leasing Co. v. Capital Barik. N.A.. 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the Debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

39.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the Debtor's estate"); See also In Re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the Debtor's assets).

40.     Section 365(a) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if -- (A) the trustee assumes such contract. . . and (B) adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); See also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that Debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from Debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

41.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under chapter 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [chapter 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's Assets. See e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) ("section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

42.     The Debtor respectfully submits that the proposed cure procedures for the identification and payment of Cure Amounts (the "Cure Procedures") are appropriate and reasonably tailored to provide non-Debtor counter-parties to potential Assumed or Rejected Contracts with adequate notice of the proposed rejection or assumption and assignment of their applicable contract, as well as the proposed Cure Amounts related thereto, if any. Such non-Debtor parties to the potential Assumed or Rejected Contracts will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, this Court will determine related disputed issues (including any adequate assurance of future performance issues).

Accordingly, the Debtor submits that implementation of the proposed Cure Procedures is appropriate in this case.

### C. The Sale of Assets Is Authorized by Bankruptcy Code Section 363(b)

43. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this District and elsewhere have required that such use, sale or lease be based upon a debtor's sound business judgment. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); In re Decora Indus., Inc., 2002 WL 32332749, *2 (D.Del. 2002); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

44. The business judgment rule shields a debtor's management from judicial second-guessing. See In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc. 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

45. Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). When applying the 'business judgment' standard, courts show great deference to a debtor's business decisions. See In re First Wellington Canyon Assocs., 1989 U.S. Dist. LEXIS 10687 at *8-9 (N.D. Ill. 1989) ("Under this test, the debtor's

business judgment . . . must be accorded deference unless shown that the bankruptcy's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion."); <u>In re Trans World Airlines.</u>, 2001 Bankr. LEXIS 267 at *45-50 (Bankr. D. Del. 2001) (describing business judgment rule as "very deferential standard").

46.     The fairness and reasonableness of the consideration to be paid for the Debtor's assets by the Purchaser, as may be declared at the Sale Hearing, will be conclusively demonstrated by the exposure of the opportunity to the marketplace.  The Debtor proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of its business for the benefit of the Debtor's estate and its creditors.

47.     Here, the Debtor has amply demonstrated sound business judgment in proposing the Bid Procedures and Auction process to sell the assets of the Debtor.   Under the circumstances, the Bid Procedures and Auction process represent the best way to achieve substantial consideration for the Debtor's assets, and offer the best resolution to the Debtor's current financial situation in the manner that will maximize the value available to the Debtor's estate and its creditors.

48.     The decision to sell all or substantially all of the Debtor's assets pursuant to a sale under section 363 of the Bankruptcy Code  is an exercise of sound business judgment under the circumstances.

49.     Courts repeatedly have concluded that the sale of a debtor's assets is appropriate where there are sound business reasons and no evidence of fraud or collusion.  <u>See</u> <u>In re Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143 (3rd. Cir. 1986) (sale of all assets appropriate where purchaser acted in good faith, and there was no fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 178-79 (D. Del. 1991); <u>Stephens Industries, Inc. v. McClung</u>, 789 F.2d 386

(6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"); In re Coastal Industries, Inc., 63 B.R. 361 (Bankr. N.D. Ohio 1986). As discussed, there is ample business justification for the proposed Transaction, ample evidence that the Bid Procedures have been pursued in good faith, and there is no fraud or collusion between the Debtor and any Potential Bidder.

**D.** **The Sale of Assets Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Section 363(f).**

50. The Debtor respectfully submits that it is appropriate to sell the Acquired Property free and clear of all interests, pursuant to section 363(f) of the Bankruptcy Code, with all such interests attaching to the net sale proceeds of the Acquired Property to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

A. applicable nonbankruptcy law permits sale of such property free and clear of such interests;

B. such entity consents;

C. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

D. such interest is in bona fide dispute; or

E. such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

51. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Property free and clear of the interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, *12

(Bankr. S.D.N.Y. 1992) (Section 363(f) is in the disjunctive, such that the sale free of interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

52.     The Debtor believes that one or more of the tests under section 363(f) will be satisfied with respect to the transfer of the Assets pursuant to the proposed Sale Order (which will be provided prior to the Sale Hearing.  In particular, the Debtor believes that if they adhere to the Bid Procedures, section 363(f)(2) will be satisfied.

53.     The Debtor understands and acknowledges that certain injunctive relief may be agreed to or imposed upon the Debtor related to its marketing approach, which relief may be enforceable against the prevailing purchaser.

**NOTICE**

54.     A copy of the Motion was served upon the following parties via telecopier, e-mail, regular United States mail, postage pre-paid, or overnight delivery, delivery prepaid pursuant to Bankruptcy Rule 4001: (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the DIP Term Lender and Proposed Buyer; (iv) Financial Resource Associates, Inc., 10901 Reed Hartman Hwy., Ste. 320, Cincinnati, OH 45242 (Attn:  Leonard Z. Eppel (fralze@juno.com); (v) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202

(Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (vi) holders of the 25 largest unsecured claims; and (vii) any governmental unit listed in LBR 5003-1(d). In light of the nature of the relief requested herein and the irreparable harm to the Debtor, the estate and its creditors that will ensue if the relief herein is not granted, the Debtor submits that no other or further notice is required.

## NO PRIOR REQUEST

55.     No previous motion for the relief requested herein has been made to this or any other

court.

## CONCLUSION

Wherefore, the Debtor respectfully requests that the Court issue an order, substantially in the

form annexed hereto, granting the relief requested herein and such other and further relief as the

Court deems just and proper.

Dated:  June 11, 2009                          Respectfully submitted,
        Cincinnati, Ohio

                                               DINSMORE AND SHOHL, LIP

                                               */s/ Kasey T. Ingram*
                                               Kasey T. Ingram (OH# 0075234)
                                               Kim Martin Lewis (OH#  0043533)
                                               Patrick D. Burns (OH# 0081111)
                                               1900 Chemed Center
                                               255 East Fifth Street
                                               Cincinnati, Ohio 45202
                                               Telephone:  513-977-8200
                                               Facsimile:  513-977-8141
                                               kasey.ingram@dinslaw.com
                                               kim.lewis@dinslaw.com
                                               patrick.burns@dinslaw.com

                                               Proposed Counsel for the Debtor and
                                                  Debtor-in-Possession

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "<u>Agreement</u>") is made and entered into as of June 8, 2009, by and between Berean Christian Stores, LLC, a Delaware limited liability company (the "<u>Seller</u>"), and Berean Christian Stores Endeavor, LLC, a California limited liability company (the "<u>Buyer</u>").  Seller and Buyer are sometimes individually referred to as a "<u>Party</u>" and together as the "<u>Parties</u>."

RECITALS

WHEREAS, Seller is a specialty retailer of Christian books, music and other religious-themed products (the "<u>Business</u>");

WHEREAS, Seller intends to file a voluntary petition for relief under the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Ohio, Western Division (the "<u>Bankruptcy Court</u>") (the proceeding to be administered under Chapter 11 with respect to such filing is hereinafter referred to as the "<u>Chapter 11 Case</u>");

WHEREAS, Buyer and Seller have determined that it is in their respective best interests for Seller to sell, convey, assign, transfer and deliver to Buyer, and for Buyer to acquire from Seller, the assets used in Seller's Business on the terms and conditions contained in this Agreement;

WHEREAS, the Parties desire to consummate the transactions contemplated by this Agreement as promptly as practicable after the satisfaction or waiver of all other conditions set forth herein; and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

a.

DEFINITIONS

2)      Definitions.  As used herein, the following terms have the meanings set forth below:

(b)      "<u>Accounts Receivable</u>" means the outstanding accounts receivable, notes receivable, notes and other receivables in favor of Seller and all claims arising in connection therewith.

(c)      "<u>Adjusted Inventory</u>" shall have the meaning given in Section 2.6(a)(ii).

(d)     <u>"Affiliate"</u>  means, with respect to any specified Person, any Person that (directly or indirectly through one or more intermediaries) controls, is controlled by, or is under common control with, the specified Person (including such Person's subsidiaries).

(e)     <u>"Alternative Transaction"</u> means the sale of any material portion of the Purchased Assets to a Person other than Buyer or an Affiliate of Buyer, whether effectuated through a sale of assets, a sale of equity securities or any similar transaction.

(f)     <u>"Assumed Contract"</u> means (i) any Contract that is designated by Buyer as an Assumed Contract by written notice to Seller prior to the Closing, or (ii) any Contract that is not a Material Contract.

(g)     <u>"Agreement"</u>  has the meaning set forth in paragraph 1.

(h)     <u>"Assignment Order"</u>  has the meaning set forth in Section 2.4.

(i)     <u>"Assumed Liabilities"</u> has the meaning set forth in Section 2.3.

(j)     <u>"Back-Up Bidder"</u> has the meaning set forth in Section 8.2(e).

(k)     <u>"Bankruptcy Code"</u>  means Title 11 of the United States Code entitled "Bankruptcy,"  as now and hereafter in effect, or any successor statute.

(l)     <u>"Bankruptcy Court"</u>  has the meaning set forth in the Recitals.

(m)     <u>"Bid Procedures Order"</u>  means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit A.

(n)     <u>"Bill of Sale"</u> means the Bill of Sale, Assignment and Assumption Agreement substantially in the form of Exhibit B hereto.

(o)     <u>"Books and Records"</u>  means the books and records of Seller including without limitation, (i) all merchandise, analysis reports, marketing reports and creative material, (ii) all records relating to customers, suppliers or personnel of Seller, (iii) all records relating to all business and marketing plans of Seller, and (iv) all books, ledgers, files, reports, plans, and operating records of every kind of Seller.

(p)     <u>"Break-Up Fee"</u> has the meaning given in Section 8.2(b).

(q)     <u>"Business"</u>  has the meaning set forth in the Recitals.

(r)     <u>"Business Day"</u>  shall mean any day other than any Saturday, Sunday or legal holiday in Cincinnati, Ohio.

(s)     <u>"Buyer"</u>  has the meaning set forth in paragraph 1.

(t)     "Buyer Governmental Approvals" has the meaning set forth in Section 4.4.

(u)     "Cash Flow Statement" has the meaning set forth in Section 5.9(a).

(v)     "Chapter 11 Case" has the meaning set forth in the Recitals.

(w)     "Closing" has the meaning set forth in Section 2.9.

(x)     "Closing Date" has the meaning set forth in Section 2.9.

(y)     "COBRA" means continuation of an employer's group health coverage as provided under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and comparable continuation coverage as provided under any similar state law, all as applicable and as amended.

(z)     "Confidentiality Agreement" has the meaning set forth in Section 5.10.

(aa)    "Contracts" means the Leases and any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party and which Seller is permitted under the Bankruptcy Code to assume and assign.

(bb)    "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise.

(cc)    "Cure Cost" means the amount necessary to cure any default under any Contract pursuant to Section 365 of the Bankruptcy Code and to allow such Contract to be assumed by Seller and assigned to Buyer in accordance with the provisions of Sections 365 and 1123 of the Bankruptcy Code.

(dd)    "Cure Notice" has the meaning set forth in Section 7.1(d).

(ee)    "DIP Financing" means all obligations owed by Seller to SANI Pacific, an Affiliate of Buyer, pursuant to the DIP Financing Agreement.

(ff)    "DIP Financing Agreement" means that certain Debtor-in-Possession Financing Agreement between Seller and SANI Pacific (an Affiliate of Buyer), dated as of June 7, 2009, to be filed with the Bankruptcy Court on the date of the commencement of the Chapter 11 Case or as soon thereafter as practicable.

(gg)    "Employee Benefit Plan" means each employee benefit plan (as such term is defined in Section 3(3) of ERISA) and each other benefit plan, program or arrangement maintained, sponsored, contributed or required to be contributed to or for the benefit of any employee, officer, director, or contractor of Seller or any ERISA Affiliate of Seller.

(hh)    "Environmental Laws"  means all federal, state and local statutes, regulations, ordinances, and similar provisions having the force or effect of law, all judicial and administrative orders and determinations, and all common law, in each case concerning public or occupational health and safety, pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Material (including without limitation CERCLA and analogous state laws), each as amended or in effect prior to, on or after Closing.

(ii)    "Equipment"  means the equipment of Seller, including, without limitation, the equipment set forth on Schedule 1.1(bb) hereto, other than any Excluded Assets.

(jj)    "ERISA"  means the Employee Retirement Income Security Act of 1974, as amended.

(kk)    "ERISA Affiliate"  means any Person that is treated as a single employer with Seller for purposes of Section 414 of the IRC.

(ll)    "Excluded Assets" has the meaning set forth in Section 2.2.

(mm)    "Excluded Contract"  means any Contract other than an Assumed Contract.

(nn)    "Expense Reimbursement" has the meaning given in Section 8.2(f).

(oo)    "Financial Statements"  has the meaning set forth in Section 3.7.

(pp)    "Fixtures" means all trade fixtures located at the Leased Real Property included in the Purchased Assets.

(qq)    "GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

(rr)    "Gift Card Liability" means an obligation to recognize up to $460,000 in the aggregate under gift cards sold by Seller as a credit against the price of merchandise sold by Buyer.

(ss)    "Governmental Authority"  means any court, tribunal, bureau, board department, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

(tt)    "Hazardous Material"  means (i) petroleum and petroleum products, radioactive materials, asbestos-containing materials, mold, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (ii) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous

wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law, and (iii) any other chemical, material or substance which is regulated by any Environmental Law.

(uu)  "Intellectual Property" means all of the following used and/or related to the Business, regardless of whether such are owned by Seller: (i) trademarks, service marks, trade dress, logos, slogans, designs, trade names, and Internet domain names, applications, registrations, and renewals in connection therewith, and all goodwill associated with any of the foregoing, (ii) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, and patent disclosures, together with reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (iii) copyrights and works of authorship, and applications, registrations, and renewals in connection therewith, (iv) trade secrets and confidential business information (including ideas, research and development, know-how, and customer and supplier lists), (v) computer software (including source code, executable code, data, databases, and related documentation), (vi) other proprietary and intellectual property rights, and (vii) copies and tangible embodiments of any of the foregoing (in whatever form or medium), including all intellectual property set forth on Schedule 3.16.

(vv)  "Inventory" means all inventory of Seller of any kind or nature, whether or not prepaid, and wherever located.

(ww)  "IRC" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the IRC are to the IRC as in effect on the date of this Agreement and any subsequent amendments or supplements thereto or substitutions therefor.

(xx)  "Knowledge" means the actual knowledge, after reasonable investigation and due diligence inquiry into the relevant matter.

(yy)  "Latest Balance Sheet" has the meaning set forth in Section 3.7.

(zz)  "Leased Real Property" means all of Seller's leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property.

(aaa)  "Leases" means all leases, subleases, licenses, concessions and other agreements pursuant to which Seller holds an interest in Leased Real Property.

(bbb)  "Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, claim, liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a

successor, transferee or continuation of Seller or the Business, and (iv) any leasehold interest, license or other right, in favor of a third party or a Seller, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

(ccc)   "Material Adverse Effect"   means any change, effect, event, occurrence, development, circumstance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of Seller, taken as a whole.

(ddd)   "Material Contracts"   has the meaning set forth in Section 3.19.

(eee)   "Necessary Consent" has the meaning set forth in Section 2.4.

(fff)   "Party"   has the meaning set forth in paragraph 1.

(ggg)   "Parties"   has the meaning set forth in paragraph 1.

(hhh)   "Permits"   means all licenses (but not, for the sake of clarity, intellectual property licenses), permits (including environmental and occupancy permits), certificates, registrations, approvals, franchises, consents and other authorizations of Seller obtained from or filed with a Governmental Authority and used in connection with the Business.

(iii)   "Permitted Liens"   means (i) statutory liens for Taxes, assessments or other governmental charges not yet due and payable, (ii) mechanics', carriers', workers', repairers', landlords' and similar liens which arose or were incurred in the ordinary course of business and which secure obligations which are not yet due and payable and which do not exceed $25,000 in the aggregate at any time, (iii) liens which are expressly assumed or consented to by Buyer herein (including, without limitation, liens included in the Assumed Liabilities), and (iv) liens which are created by Buyer.

(jjj)   "Person"   means any natural person, corporation, limited liability company, general partnership, limited partnership, sole proprietorship, trust, union, association, Governmental Authority or other business organization.

(kkk)   "Prevailing Bidder" has the meaning given in Section 8.1(j).

(lll)   "Purchased Assets"   means all assets, properties, rights, titles and interests of every kind and nature owned, leased or licensed by Seller or any of Seller's Affiliates, including, without limitation, all (i) Books and Records, (ii) Assumed Contracts and all of the rights and benefits accruing thereunder, including any outstanding deposits thereunder, (iii) Equipment, (iv) Fixtures, (v) Inventory, (vi) Intellectual Property, (vii) transferable Permits, (viii) Security Deposits, (ix) Supplies, (x) Accounts Receivable, (xi) advertising, marketing and promotional materials and all other printed or written materials, (xii) goodwill as a going concern and all other intangible

properties, (xiii) telephone numbers, (xiv) insurance policies and the proceeds thereof, (xv) other tangible and intangible assets, and (xvi) claims and causes of action Seller may have against third parties directly related to any of the foregoing items; in each case excluding any assets that are expressly identified as Excluded Assets.

(mmm)"Purchase Price"  has the meaning set forth in Section 2.6(a).

(nnn)  "Purchase Price Adjustment"  has the meaning set forth in Section 2.6(a).

(ooo)  "Rehired Employee"  has the meaning set forth in Section 5.2(a).

(ppp)  "Related Agreements"  means the Bill of Sale and any other agreement, certificate or similar document executed pursuant to or in connection with this Agreement.

(qqq)  "Related Person"  means, with respect to a specific Person, any officer, director, member, manager, employee, agent, shareholder, representative, successor or assign of such Person.

(rrr)  "Release"  means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, or placing into or upon any land, building, surface, subsurface or water or air or otherwise entering into the environment.

(sss)  "Retained Liabilities" has the meaning set forth in Section 2.3.

(ttt)  "Sale Order"  means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit C.

(uuu)  "Security Deposits"  means the deposits, advances, credits and security deposits made by or held by Seller in respect of the Purchased Assets and/or the Business, including, without limitation, those listed on Schedule 1.1(hhh) hereto, but only to the extent any such deposits, advances, credits and security deposits are transferable, and are actually transferred, from Seller to Buyer in connection with the transactions contemplated hereby.

(vvv)  "Seller"  has the meaning set forth in paragraph 1.

(www) "Seller Governmental Approvals" has the meaning set forth in Section 3.4.

(xxx)  "Supplies"  means all office supplies, other miscellaneous supplies, and other tangible property of any kind of Seller, wherever located, which are/is used in the Business.

(yyy)  "Target Amount"  shall have the meaning given in Section 2.6(a).

(zzz)  "Transferred Amount" shall have the meaning given in Section 2.6(a).

(aaaa)  "Taxes"  means any and all taxes, fees, levies, duties, tariffs, import charges and other charges imposed by any taxing authority, together with any related interest, penalties or

other additions thereto, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom, duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

1)    Rules of Interpretation.

(bbbb)  The singular includes the plural and the plural includes the singular.

(cccc)  The word "or"  is not exclusive.

(dddd)  A reference to a Person includes its successors and permitted assigns.

(eeee)  The words "include,"  "includes"  and "including"  are not limiting.

(ffff)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes and Appendices to any document shall be deemed incorporated by reference in such document.

(gggg) References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(hhhh) The words "hereof,"  "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(iiii)    References to "days"  shall mean calendar days, unless the term "Business Days"  shall be used.

(jjjj)    This Agreement is the result of negotiations among, and has been reviewed by, the Parties.  Accordingly, this Agreement shall be deemed to be the product of both Parties, and no ambiguity shall be construed in favor of or against either Party.

a.

PURCHASE AND SALE OF ASSETS

     2) Sale of Purchased Assets to Buyer. Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Section 363 and 365 of the Bankruptcy Code, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, except Permitted Liens.

     3) Excluded Assets. Notwithstanding Section 2.1, the Parties acknowledge that Seller shall not sell, assign, transfer or convey to Buyer, and Buyer shall not purchase, acquire or accept from Seller, any of the following assets (all such assets, the "Excluded Assets"):

    (kkkk) all assets, properties and rights of Seller listed on Schedule 2.2(a) hereto;

    (llll) all Excluded Contracts;

    (mmmm) all corporate seals, corporate organizational records, minute books, charter documents, record books, and stock transfer books pertaining to Seller;

    (nnnn) all causes of action of Seller under Chapter 5 of the Bankruptcy Code, including but not limited to those related to any preferences or fraudulent conveyances, but excluding any such causes of action related to Buyer (which shall be included in the Purchased Assets);

    (oooo) all causes of action of Seller against third parties that are not directly related to a Purchased Asset or Purchased Assets; and

    (pppp) all cash and cash equivalents and all bank accounts.

     1) Liabilities.

    (qqqq) Upon the terms and subject to the conditions contained in this Agreement, at the Closing, as between Buyer and Seller, Buyer shall assume or otherwise be responsible only for (i) liabilities and obligations under the Assumed Contracts accruing or arising after the Closing (other than any liability arising out of a breach of any such Contract prior to the Closing), (ii) the Gift Card Liability, and (iii) the liabilities set forth on Schedule 2.3(a)(iii), other than, with respect to all of the foregoing, events or circumstances arising as a result of any action or conduct of Seller or any of its Affiliates (collectively, the "Assumed Liabilities").

    (rrrr) It is expressly understood and agreed that, except for the Assumed Liabilities, Buyer shall not assume or be liable for any liability, obligation, debt, claim against, or contract of, the Business, Seller or any of its Affiliates at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or any of its Affiliates (the "Retained Liabilities"), which Retained Liabilities include, without limitation, the following:

(i)     all Taxes of Seller, including any Taxes imposed on or with respect to the Purchased Assets for all periods ending prior to the Closing except for any sales, use, value added, transfer, stamp and similar taxes applicable to the transactions contemplated by this Agreement;

(ii)     all liabilities and obligations arising out of or in connection with the Excluded Assets;

(iii)     notwithstanding any other provision contained in this Agreement, any and all liabilities and obligations of Seller with respect to any indebtedness for borrowed money incurred or arising prior to Closing, and any and all liabilities of Seller for and relating to any guaranties, incurred or arising prior to Closing, of any indebtedness for borrowed money of any Person.

1)     Assignment Order.  With respect to any Purchased Assets which by their respective terms are not assignable without the consent of a third party, prior to the Closing, Seller shall file a motion with the Bankruptcy Court requesting that the Bankruptcy Court enter an order, in form and substance acceptable to the Buyer, pursuant to Section 365 of the Bankruptcy Code, providing that all such Purchased Assets shall be assumed by Seller and assigned to Buyer without the necessity of obtaining such consent (an "Assignment Order").  Such Assignment Order shall be incorporated into and deemed part and parcel of the Sale Order.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof and (b) the Bankruptcy Court shall not have entered an Assignment Order providing that such Necessary Consent is not required.  In such event, Seller shall use its commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset.  In order, however, to provide Buyer the full realization and value of the Purchased Assets, Seller agrees that on and after the Closing, it will, at the request and under the direction of Buyer, in the name of Seller or otherwise as Buyer shall specify, use commercially reasonable efforts (a) to assure that the rights of Seller under any such Purchased Assets shall be preserved for the benefit of Buyer and (b) to facilitate receipt of the consideration to be received by Seller in and under every such Purchased Asset, which consideration shall be held for the benefit of, and shall be delivered to, Buyer.  Nothing in this Section 2.4 shall in any way diminish or enlarge (x) Seller's obligations hereunder to use commercially reasonable efforts to obtain consents and approvals,  and to take all such other actions specified herein prior to or at Closing as are necessary to enable Seller to convey and assign good and valid title to all the Purchased Assets to Buyer or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

2)     Amounts Held in Trust.  Any amounts received by Buyer after the Closing with respect to any Excluded Asset or with respect to the operation of the Business prior to the Closing shall be held by Buyer in trust for Seller until promptly paid to Seller.  Likewise,

any amounts received by Seller after the Closing with respect to any Purchased Asset or with respect to the operation of the Business after the Closing shall be held by Seller in trust for Buyer until promptly paid to Buyer.

3)     Purchase Price.

(ssss)   The aggregate purchase price for the Purchased Assets shall be One Million Six Hundred Thousand Dollars ($1,600,000) (the "Purchase Price").   The Purchase Price is based on the following minimum amounts of certain assets in the Purchased Assets:

(i)     Inventory not less than $4,000,000;

(ii)    Accounts Receivable not less than $460,000; and

(iii)   Fixtures and Equipment not less than $1,850,000.

(tttt)   Buyer shall be permitted to credit bid, pursuant to Section 363(k) of the Bankruptcy Code, up to the amount of the DIP Financing.  To the extent the Purchase Price of $1,600,000 exceeds the DIP Financing, Buyer shall deliver such excess amount in cash, by wire transfer of immediately available funds at Closing.

1)     Assumed Contracts and Cure Costs.  On or prior to the Closing, Seller shall assume and assign to Buyer all Assumed Contracts and Seller shall pay all Cure Costs.

2)     Taxes.

(uuuu) To the extent that the transactions contemplated by this Agreement are not exempt from Taxes and except as set forth in Section 2.3(a)(v), Buyer shall be liable for all such Taxes, duties, costs and fees (and any penalties and interest associated with the foregoing), arising from or relating to the consummation of the transactions contemplated by this Agreement or any Related Agreement.  Seller and Buyer shall cooperate in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable laws in connection with the payment of such Taxes, and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any such Taxes payable in connection therewith.

(vvvv) Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Purchased Assets and all ad valorem, real property, personal property and similar Taxes with respect to the Purchased Assets shall be prorated as of the Closing Date.  In the event Seller shall be entitled to a payment from Buyer upon the calculation of such prorations, Buyer shall make any such payment to Seller promptly following the Closing, and in the event Buyer shall be entitled to a payment from Seller upon the calculation of such prorations, Seller shall make any such payment to Buyer pursuant to the terms of the requirements of the Bankruptcy Code.

1)      Time and Place of Closing.   The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Dinsmore & Shohl LLP, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202, within five (5) Business Day(s) after all conditions to Closing set forth in Article 6 of this Agreement have been satisfied or waived (the "Closing Date").  At the Closing, the Parties shall execute and deliver the Related Agreements. The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof.  The Closing will be effective as of 12:01 a.m. EDT on the Closing Date.

2)      Purchase Price Allocation.   Buyer and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in a manner consistent with the fair market values determined in good faith and on a reasonable basis by Buyer and Seller prior to the Closing Date.  Such allocation shall be consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder.  In addition, Buyer and Seller shall prepare IRS Form 8594 and related exhibits and shall act in accordance with the allocation agreed to by the Parties on such Form 8594 and in the preparation, filing and audit of any and all Tax returns.

3)      Adequate Assurance.   Buyer agrees to furnish any reasonably necessary information pertaining to the satisfaction of the requirement of adequate assurances of future performance on Contracts as required under Section 362(f)(2)(B) of the Bankruptcy Code.

4)      Subject to Approval of Bankruptcy Court.   This Agreement is subject to the approval of the Bankruptcy Court and shall not become effective, nor shall it be deemed binding on any party hereto, until such approval is evidenced by a final order of such court.

a.

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding Disclosure Schedules, Seller represents and warrants to Buyer as follows:

5)      Organization.   Seller is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Subject to the Bankruptcy Court's entry of the Sale Order, Seller has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

6)      Execution and Delivery.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the Related Agreements by Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by Seller, and no other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements by Seller and, subject to the selection of Buyer's bid as the highest and best offer by Seller's board of directors, the consummation of the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by Seller of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

7)      No Conflicts.  Except as set forth on <u>Schedule 3.3</u> and <u>Schedule 3.4</u>, the execution and delivery by Seller of this Agreement and the Related Agreements, the performance of its obligations under this Agreement and the Related Agreements and the consummation of the transactions contemplated hereby and thereby do not and shall not:

(wwww)      Conflict with or result in a violation or breach of any of the terms, conditions or provisions of its articles of organization or operating agreement, as applicable;

(xxxx) Conflict with or result in a violation or breach of any term or provision of any law, statute, rule, regulation or order applicable to Seller or any of the Purchased Assets; or

(yyyy) Conflict with or result in a violation or breach of, or constitute a default under, or require Seller to obtain any consent or approval under the terms of, or give any third party the right to terminate, modify or accelerate any obligation under, any contract, lease or license included in the Purchased Assets or by which any of the Purchased Assets is bound, except to the extent that such rights are not enforceable due to the operation of the Bankruptcy Code and/or order of the Bankruptcy Court, and except, in the case of clause (c), for any such conflicts, violations, breaches or defaults that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

1)      Governmental Approvals and Filings.  Subject to obtaining the approvals set forth in <u>Schedule 3.4</u>  ("<u>Seller Governmental Approvals</u>"), no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Seller or on behalf of the Business is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

2)      Brokers.  Except as set forth on <u>Schedule 3.5</u>, neither Seller nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation arising out of the transactions contemplated by this Agreement.

3)	Compliance with Laws.  With respect to the Business, except as set forth in <u>Schedule 3.6</u>, Seller has complied in all respects with and is in compliance with, and is not in default under, all applicable laws, regulations, orders and ordinances of any Governmental Authority other than any such non-compliance or default that would not create a Material Adverse Effect, and no claims have been filed against Seller alleging a violation of any such laws, regulations, orders or ordinances, and Seller has not, except as set forth in <u>Schedule 3.6</u>, received written (or, to Seller's Knowledge, oral) notice of any such violations.  <u>Schedule 3.6</u> sets forth a true and correct list of all Permits necessary in connection with the operation of the Business, and, except as set forth on <u>Schedule 3.6</u>, Seller holds all such Permits in full force and effect, Seller is not in violation of such Permits, and there is no pending or, to the Knowledge of Seller, threatened revocation, cancellation or suspension of any such Permit.

4)	Financial Statements and Related Matters.  Set forth on <u>Schedule 3.7</u> hereto are copies of the following financial statements of the Business (i) unaudited balance sheet as of April 30, 2009 (the "Latest Balance Sheet") and the related statement of income for the 3-month period then ended and (ii) an unaudited balance sheet and statements of income for the fiscal year ended January 31, 2009 and an audited balance sheet, statement of operations and members' capital and statement of cash flows for the fiscal year ended February 2, 2008 (the "<u>Financial Statements</u>").  The Financial Statements were prepared in accordance with GAAP, are true and correct in all material respects and fairly present, in all material respects, the financial condition and results of operations of Seller as of the dates and for the periods indicated, subject, in the case of interim statements, to normal year-end adjustments (which shall not be material) and the absence of footnotes.  Seller has made and kept books and records that accurately reflect, in all material respects, the transactions and affairs of Seller.

5)	Absence of Certain Developments.  Except as set forth on <u>Schedule 3.8</u>, since January 1, 2009, other than as a result of the commencement of the Chapter 11 Case, there has not been, occurred, or arisen any agreement, condition, action, omission, or event that (a) would result in a breach of Section 5.6 or require the consent of Buyer under Section 5.7; or (b) has had or would reasonably be expected to have a Material Adverse Effect.

6)	Title to Assets; Sufficiency of Assets.

(zzzz)  Except as set forth on <u>Schedule 3.9</u> hereto, Seller has good and marketable title to, or a valid leasehold interest in or right to use pursuant to a license set forth on <u>Schedule 3.16</u>, the Purchased Assets.  Except as described on <u>Schedule 3.9</u> hereto, the Purchased Assets are in substantially good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business.

(aaaaa)	Seller owns or leases all buildings, structures, improvements, machinery, equipment, and other tangible assets necessary for the conduct of the Business as presently conducted.  This Agreement and the documents contemplated hereby, when duly executed and

delivered by Seller to Buyer at the Closing, will effectively vest in Buyer good and marketable title to the Purchased Assets, subject only to the Permitted Liens.

1)      Litigation; Orders.  Except as set forth on Schedule 3.10 hereto, (a) there are no actions, suits, arbitration proceedings, grievances, complaints, charges, proceedings, orders, investigations or claims pending or, to the Knowledge of Seller, threatened against or affecting Seller related to the Business or the Purchased Assets at law or in equity which, if adversely decided, would have a Material Adverse Effect, (b) to the Knowledge of Seller, Seller is not subject to any governmental investigations or material inquiries related to the Business or the Purchased Assets which, if adversely decided, would have a Material Adverse Effect, and (c) Seller is not, with respect to the Business, subject to any order of any Governmental Authority (or settlement enforceable therein).

2)      Employee Benefit Plans.

(bbbbb)      Schedule 3.11 hereto sets forth a complete and correct list of each Employee Benefit Plan.  To the Knowledge of Seller, each Employee Benefit Plan has been maintained, funded and administered in accordance with its terms and in all material respects complies in form and in operation with the applicable requirements of ERISA and the IRC.  All contributions and premium payments required to be made with respect to any Employee Benefit Plan for time periods ending on the Closing Date have been made as of the Closing Date.  Other than routine claims for benefits, there is no action, suit, proceeding, audit, hearing, investigation, claim or lawsuit pending or, to the Knowledge of Seller, threatened against or relating to an Employee Benefit Plan.

(ccccc) Each Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC has received a favorable determination letter from the IRS or may reasonably rely on the opinion or notification letter received by the sponsor of a prototype plan adopted by Seller, if applicable, and to the Knowledge of Seller, there is no event or circumstance that will or could give rise to disqualification or loss of tax-exempt status of any such Employee Benefit Plan or related trust. Each such Employee Benefit Plan has been timely amended to include the interim amendments required by the applicable cumulative list pursuant to IRS Revenue Procedure 2007-44.

(ddddd)      To the Knowledge of Seller, no non-exempt "prohibited transaction" (within the meaning of IRC Section 4975 or Section 406 of ERISA) has occurred with respect to any Employee Benefit Plan, and no fiduciary of any Employee Benefit Plan has any material liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any Employee Benefit Plan.

(eeeee) None of the Employee Benefit Plans is a plan providing medical, health or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses, or their dependents or for any other Person not actively employed by Seller (other than in

accordance with COBRA). To the Knowledge of Seller, Seller and the ERISA Affiliates are in material compliance with the requirements of COBRA.

(fffff) To the Knowledge of Seller, neither Seller nor any ERISA Affiliate has any liability under Title IV of ERISA that could become a liability of Buyer, including on account of a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA, respectively) from any multiemployer plan (as defined in Section 3(37) of ERISA) or a failure to make any required contribution to any such multiemployer plan.

(ggggg) Seller has delivered or made available to Buyer: (i) true and complete copies of all plan documents, amendments, trust agreements, insurance contracts, administrative contracts and summary plan descriptions with respect to the Employee Benefit Plans; (ii) summary descriptions of any Employee Benefit Plans not otherwise in writing; (iii) the IRS Form 5500 and financial report filed in each of the most recent three plan years for any Employee Benefit Plan subject to such filing requirements; and (iv) all material correspondence with any Governmental Authority relating to any outstanding controversy, audit, or closing agreement request.

1) Labor Matters. Except as set forth in <u>Schedule 3.12</u> hereto, with respect to the Business (i) Seller is not a party to any collective bargaining agreement and does not have any relationship with any labor organization, (ii) Seller is in compliance in all material respects with all applicable laws relating to employment and employment practices, the employment of labor, and, to the Knowledge of Seller, has not engaged in any unfair labor practice or unlawful employment practice, and there are no pending or unremedied grievances or unfair labor practices or other employment-related claims against Seller, (iii) there is no labor strike, slowdown or work stoppage relating to Seller pending or, to the Knowledge of Seller, threatened against Seller, (iv) Seller has not experienced any work stoppages or been a party to any proceedings before the National Labor Relations Board or other Governmental Authority involving any issues for the three years prior to the date hereof or been a party to any arbitration proceeding arising out of or under collective bargaining agreements for the three years prior to the date hereof, (v) Seller has not within the three years prior to the date hereof received notice of any employment-related charge or complaint against Seller before the Equal Employment Opportunity Commission or the Department of Labor or any other Governmental Authority, and (vi) Seller has not implemented any plant closing or mass layoff of employees that could implicate the WARN Act or similar state, local or foreign laws or regulations.

2) Taxes. Except as set forth on <u>Schedule 3.13</u> attached hereto:

(hhhhh) During the last three years, Seller has filed all Tax returns that it was required to file under applicable laws and regulations. All Taxes due and owing by (or with respect to the operations of) Seller shown on any such Tax Returns have been paid (or Seller has made adequate provision for such Taxes) or are being contested in good faith. Seller has not received any

written notice from any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is subject to taxation by that jurisdiction.

(iiiii) To Seller's Knowledge, no foreign, federal, state, or local Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to Seller. Seller has not received from any foreign, federal, state, or local taxing authority (including jurisdictions where Seller has not filed Tax Returns) any (i) written notice indicating an intent to open an audit or other review, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority against Seller.

1) **Environmental Matters.** Except as set forth on <u>Schedule 3.14</u> hereto, with respect to the Business and the Purchased Assets Seller is in compliance in all material respects with all Environmental Laws. There has been no Release of any Hazardous Material on any of the premises of the Business or, during the period of Seller's ownership or lease thereof, on any property formerly owned or leased by Seller except as would not give rise to any material liability, loss or obligation. Except as set forth on <u>Schedule 3.14</u> hereto, with respect to the Business and the Purchased Assets Seller has not received any written (or to Seller's Knowledge, oral) notice, report or other information regarding any actual or alleged violation of Environmental Laws, or any liabilities or potential liabilities for personal injury, property damage or investigatory or cleanup obligations arising under Environmental Laws.

2) **Affiliated Transactions.** Except as disclosed on <u>Schedule 3.15</u> attached hereto, no officer, director or Affiliate of Seller is a party to any material agreement, contract, commitment or transaction with Seller which is related to the Business or has any interest in any material Purchased Assets or any material property, real or personal or mixed, tangible or intangible, which is used in the Business.

3) **Intellectual Property.** <u>Schedule 3.16</u> contains a complete list of all of the following that are included in the Business Intellectual Property: (a) issuances, registrations and applications for registration of Intellectual Property, (b) material unregistered trademarks, service marks, logos, slogans, designs, trade names and copyrights, and (c) computer software (other than mass-marketed software with a replacement cost and/or annual license fee of less than $10,000). Seller owns, free and clear of all Liens other than Permitted Liens, all right, title and interest in or to, or has the right to use pursuant to license set forth on <u>Schedule 3.16</u>, all material Intellectual Property used in the conduct of the Business as presently conducted. The Business Intellectual Property owned by Seller and, to Seller's Knowledge all other Business Intellectual Property, is valid, subsisting and enforceable. Except as set forth on <u>Schedule 3.16</u>, (x) there are no claims pending, or to Seller's Knowledge threatened, against Seller contesting the validity, use, ownership or enforceability of any of the Business Intellectual Property, and, to Seller's Knowledge, there is no basis for any such claim, (y) to Seller's Knowledge, the operation of the Business as currently conducted does not infringe, misappropriate or otherwise conflict with any Intellectual Property of any other Person, and Seller has not received any written (or to Seller's Knowledge, oral) notices regarding the foregoing (including, any demands or offers to license any Intellectual Property

from any other Person), (z) to Seller's Knowledge, no third party has infringed, misappropriated or otherwise conflicted with any of the Business Intellectual Property. The transactions contemplated by this Agreement shall not impair the right, title or interest of Seller in and to the Business Intellectual Property, and all of the Business Intellectual Property shall be owned or available for use by Buyer immediately after the Closing on terms and conditions substantially similar to those under which Seller owned or used the Business Intellectual Property immediately prior to the Closing.

4)     Real Property.  Seller does not own any real property which is used or intended to be used, or otherwise related to, the Business.  Schedule 3.17(a) sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease).  Seller has delivered or made available to Buyer a true and complete copy of each such Lease.  Except as set forth in Schedule 3.17(b), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) neither Seller nor, to Seller's Knowledge, any other party to the Lease is in breach or default under such Lease, and to Seller's Knowledge no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease; (iii) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (iv) Seller's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Seller's Knowledge, there are no disputes with respect to such Lease; (v) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; and (vi) Seller does not, and will not in the future, owe any brokerage commissions or finder's fees with respect to such Lease.

5)     Insurance.  Schedule 3.18 hereto lists all policies of insurance owned, held, or maintained by or for the benefit of Seller with respect to the Business or insuring the Purchased Assets, including the type and amount of coverage and the expiration dates of the policies and the loss run for the past three years.  Except as set forth on Schedule 3.18 attached hereto, Seller has not received any written notice within the last 90 days threatening suspension, revocation, modification or cancellation of any insurance policy or a material increase in any premium in connection therewith or informing Seller that any coverage listed on Schedule 3.18 attached hereto will or may not be available in the future on substantially the same terms as now in effect.  Except as set forth on Schedule 3.18, Seller does not have any self-insurance or co-insurance programs with respect to the Business.  Except as listed on the loss run set forth on Schedule 3.18 or as otherwise set forth on Schedule 3.18, Seller has not, with respect to the Business, made any insurance claims during the past three years.

6)     Contracts.

(jjjjj)   Schedule 3.19 contains a list or description of the Contracts that meet the following requirements (collectively, the "Material Contracts"):

(i)      all employment, consulting or severance agreements;

(ii)     contracts containing any obligation of Seller to indemnify any Person;

(iii)    all mortgages, indentures, notes, bonds or other agreements relating to indebtedness for borrowed money;

(iv)     all partnership agreements or joint venture agreements or other agreement involving a sharing of profits, losses, revenues, expenses or liabilities with any other Person;

(v)      any agreement (or agreements) for the lease of personal property from third parties providing for annual lease payments, individually or in the aggregate, in excess of $10,000;

(vi)     any agreement related to any franchising arrangement;

(vii)    contracts which place any limitation on the method of conducting or scope of the Business, including agreements containing covenants not to compete or solicit employees or customers or restricting the use of any Intellectual Property (including settlement agreements and coexistence agreements);

(viii)   any license or other agreement granting or obtaining any rights in or to any Intellectual Property (other than licenses of mass marketed software with a replacement cost and/or annual license fee of less than $10,000, individually or in the aggregate);

(ix)     any agreement containing a right of first refusal;

(x)      any agreement that provides for any Person to be the exclusive or a preferred provider of any product or service to Seller or the Business, or the exclusive or a preferred recipient of any product or service of Seller or the Business during any period of time or that otherwise involves the granting by Seller of exclusive or preferred rights of any kind;

(xi)     any agreement under which Seller has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) indebtedness or under which it has imposed (or may impose) a Lien, other than any Permitted Lien, on any of the Purchased Assets;

(xii)    any agreement involving payments by or to any Person based on sales, revenues or profits;

(xiii)   any power of attorney that is currently effective;

(xiv)  any guaranty or similar undertaking with respect to payment or performance by another Person;

(xv)  any other agreement (or group of related agreements) not otherwise listed on <u>Schedule 3.19</u> involving individually (or in the aggregate) more than $10,000 annually; and

(xvi)  any commitment to enter into any of the foregoing contracts or agreements described in clauses (i) through (xii).

(kkkkk)  The Material Contracts constitute all of the contracts which are material to the Business.

(lllll)  Subject to payment of the Cure Costs by Seller, each of the Material Contracts is a valid and binding contract and is in full force and effect, has been entered into in the ordinary course of business consistent with past practice and is not subject to termination except in accordance with the respective terms thereof.  Except as set forth on <u>Schedule 3.19(c)</u>, subject to payment of the Cure Costs by Seller, Seller is not in material default under and has not breached in any material respect any Material Contract, and, (i) other than the filing of the Chapter 11 Case, no condition exists within Seller's Knowledge that with notice or lapse of time or both would constitute a material default or breach by Seller thereunder, and (ii) to Seller's Knowledge, no other party is in material default under and has not breached in any material respect any Material Contract.  Subject to receipt of the Necessary Consents set forth on <u>Schedule 3.19(c)</u> and payment of the Cure Costs by Seller, the Material Contracts will continue to be in full force and effect on identical terms immediately following the consummation of the transactions contemplated hereby.  True and complete copies of the written Material Contracts including all changes, additions, or modifications thereto have been delivered or made available to Buyer prior to the date hereof.

a.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the corresponding Disclosure Schedules, Buyer represents and warrants to Seller as follows:

2)  Organization.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of California.  Buyer has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

3)  Execution and Delivery.  The execution, delivery and performance of this Agreement and the Related Agreements by Buyer, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by Buyer, and no other action on the part of Buyer is necessary to authorize the execution, delivery and

performance of this Agreement and the Related Agreements by Buyer and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and upon the execution and delivery by Buyer of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

4) No Conflicts. The execution and delivery by Buyer of this Agreement and the Related Agreements, the performance of its obligations under this Agreement and the Related Agreements and the consummation of the transactions contemplated hereby and thereby do not and shall not:

(mmmmm) Conflict with or result in a violation or breach of any of the terms, conditions or provisions of its certificate of incorporation or bylaws;

(nnnnn) Conflict with or result in a violation or breach of any term or provision of any law, statute, rule, regulation or order applicable to Buyer; or

(ooooo) Conflict with or result in a violation or breach of, or constitute a default under, or require Buyer to obtain any consent or approval under the terms of, or give any third party the right to terminate, modify or accelerate any obligation under, any contract or license to which Buyer is a party or by which any of Buyer's assets or properties is bound.

1) Governmental Approvals and Filings. Except as specifically contemplated as set forth in this Agreement (including the obtaining of the Permits set forth on Schedule 4.6 ("Buyer Governmental Approvals")), no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

2) Brokers. Neither Buyer nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Seller.

3) Adequate Funds. At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.

4) Adequate Assurances. At the Closing, Buyer shall be capable of satisfying the conditions contained in Section 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to any executory contracts or unexpired leases that Buyer seeks to include in the Purchased Assets.

a.

COVENANTS

5)     Access to Books and Records.  From and after the Closing, each Party shall afford, for a period ending on the later of (i) three (3) years from the Closing Date and (ii) the date of the conclusion of the Chapter 11 Case, the other Party and its Affiliates reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Governmental Authority, (d) in connection with any threatened or actual legal proceeding, or (e) in connection with any audit of the Business for any pre-Closing period.  During such period neither Party shall dispose of or destroy any books, records or other data relating to the operation of the Business prior to the Closing unless such Party gives the other Party thirty (30) days' prior written notice thereof and the option to retain such books, records or other data.

6)     Employees.

(ppppp)    Rehired Employees.  Buyer shall have the right, but not any obligation, to offer employment to each of the employees of Seller who remain actively employed immediately prior to the Closing (other than the persons listed in Schedule 5.2(a)), including employees who are on disability leave, worker's compensation leave, or other leave or absence immediately prior to the Closing, on such terms as Buyer determines in its sole discretion.  Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "Rehired Employees."

(qqqqq)    Standard Procedure.  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, (i) Buyer and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Rehired Employees, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Rehired Employee with respect to the portion of the year during which such Rehired Employees are employed by Buyer that includes the Closing Date, excluding the portion of such year that such Rehired Employees were employed by Seller.

(rrrrr)   No Rights Conferred Hereunder.  Nothing contained in this Agreement shall confer upon any Rehired Employee any right with respect to continuance of employment by Buyer, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Rehired Employees at any time and for any or no reason, with or without notice, or restrict Buyer, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Rehired Employees after the Closing.

(sssss) <u>Employee Benefit Plans</u>. Buyer shall not assume any Employee Benefit Plans or any obligation or liability thereunder and Buyer shall provide benefits to those Rehired Employees as of or after the Closing as Buyer, in its sole discretion, shall determine. With respect to all claims by current and former employees of Seller arising prior to or as of the Closing Date under any Employee Benefit Plans of Seller, whether insured or otherwise (including, but not limited to, life insurance, medical and disability programs), Seller shall, at its own expense, honor or cause their respective insurance carriers to honor such claims, whether made before or after the Closing, in accordance with the terms and conditions of such Employee Benefit Plans of Seller without regard to the employment by Buyer of any such employees after the Closing. Notwithstanding the foregoing, Buyer shall fulfill Seller's obligations under COBRA with respect to former employees of Seller.

(ttttt) <u>Seller's Cooperation in Hiring of Employees.</u> Seller shall cooperate in all reasonable respects with Buyer and shall permit Buyer a reasonable period prior to the Closing Date (i) to meet with employees of Seller (including managers and supervisors) at such times as Buyer shall reasonably request, (ii) to speak with such employees' managers and supervisors who are being considered for employment by Buyer at such times as Buyer shall reasonably request, (iii) to distribute to such employees of Seller such forms and other documents relating to potential employment by Buyer after the Closing as Buyer may reasonably request, and (iv) to permit Buyer's counsel, upon request and execution of any written authorizations Seller reasonably deems appropriate, to review personnel files and other relevant employment information regarding employees of Seller.

(uuuuu) <u>WARN Act.</u> Seller shall be solely responsible for any and all notices, payments, fines or assessments due to any Governmental Authority, pursuant to any applicable federal, state, local or foreign law, common law, statute, rule, regulation or ordinance with respect to the employment, discharge or layoff of employees by Seller as of or before the Closing, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (jointly, referred to throughout this Agreement as the "WARN Act") with respect to employees of Seller. As of the Closing, Seller shall provide to Buyer a list of all layoffs, by location, implemented by Seller within the 90 day period preceding the Closing.

(vvvvv) <u>No Third-Party Beneficiaries</u>. The provisions of this Section are for the sole benefit of the parties to this Agreement and their permitted successors and assigns, and nothing herein, expressed or implied, shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

1) <u>Adequate Assurances</u>. With respect to each executory contract or unexpired leases included in the Purchased Assets, Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance of such executory contract by Buyer as required by the Bankruptcy Code. Buyer shall use commercially reasonable efforts to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify

before the Bankruptcy Court. Notwithstanding the foregoing, neither Buyer nor any of its Affiliates shall be required to make any payments or security deposits or provide any guarantees, letters of credit or other forms of credit support.

2) Performance under Executory Contracts. From and after the Closing, Buyer shall fully satisfy, discharge and perform all of the obligations assumed under the Assumed Contracts pursuant to Section 2.3(a) above.

3) Cooperation. Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement. In furtherance of the foregoing, Seller shall use commercially reasonable efforts to obtain, in a diligent and prompt manner, and at its own expense, the Necessary Consents and Seller Government Approvals (and any other consents, approvals or agreements), and to give all notices and make all filings as may be necessary to authorize, approve or permit the full and complete sale, conveyance assignment and transfer of the Purchased Assets, free and clear of any Liens (other than Permitted Liens).

4) Conduct of Business Prior to Closing. During the period beginning on the date of this Agreement, and ending on the earlier of the Closing Date or termination of this Agreement pursuant to Section 8.1, Seller will continue to carry on the Business in the ordinary course consistent with past practices (taking into account the pendency of the Chapter 11 Case). Without limiting the generality of the foregoing, Seller will and will cause each of its Affiliates to:

(wwwww) use commercially reasonable efforts to (i) preserve the Business and the present reputation of the Business, (ii) maintain the goodwill of customers, suppliers, employees and other Persons with whom Seller otherwise has significant business relationships in connection with the Business, and (iii) maintain the assets of the Business in materially the same condition as that in which they exist as of the date hereof (ordinary wear and tear excepted);

(xxxxx) except to the extent required by applicable law, (i) cause the Books and Records to be maintained in the usual, regular and ordinary manner and (ii) not permit any material change in any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Seller that would materially affect the Business, the Purchased Assets or the Assumed Liabilities;

(yyyyy) comply, in all material respects, with all requirements of Governmental Authorities applicable to the Business and promptly following receipt thereof give to Buyer copies of any written notice received from any Governmental Authority or other Person alleging any violation of any such requirement;

(zzzzz) acquire Inventory to be used in the Business which is of a quality and quantity usable in the ordinary course of business and consistent with past practice and normal purchasing patterns;

(aaaaaa)    maintain levels of Inventory at each of the Leased Real Property locations consistent with past practices;

(bbbbbb)    maintain the mix/assortment of Inventory consistent with past practices;

(cccccc)    maintain the selling price to the public of each item of Inventory consistent with past practices;

(dddddd)    maintain types, levels and underwriters of insurance for the Purchased Assets consistent with past practices;

(eeeeee)    at the request of Buyer, use commercially reasonable efforts to assist Buyer in efforts to obtain amendments to or modifications of any Assumed Contract on such terms and conditions as Buyer may request in its sole discretion;

(ffffff) not permit or cause the abandonment, loss or lapse of any Intellectual Property; and

(gggggg)    maintain the Leased Real Property, including all of the improvements thereto and fixtures located thereon, and all other tangible Purchased Assets, in substantially the same condition as of the date of this Agreement, ordinary wear and tear excepted.

1)    Certain Prohibited Transactions.    During the period beginning on the date of this Agreement and ending on the earlier of the Closing Date or termination of this Agreement pursuant to Section 8.1, Seller will not with respect to the Business, without the prior written consent of Buyer (not to be unreasonably withheld):

(hhhhhh)    mortgage, pledge or otherwise encumber or sell, transfer, license or otherwise dispose of any of the Purchased Assets other than in the ordinary course of business consistent with past practice or as contemplated by this Agreement;

(iiiiii) terminate any Material Contract or make any material change to any Material Contract, or enter into any contract or agreement which would, if entered into prior to the date hereof, constitute a Material Contract;

(jjjjjj) undertake, or commit to undertake, (i) any material equipment or software purchase, or (ii) any other capital expenditures relating to the Business other than any necessary repairs or replacements in the ordinary course of business;

(kkkkkk)     intentionally perform or omit to perform any other act which would cause any representation or warranty of Seller in this Agreement to be or become untrue in any material respect, except as expressly contemplated by this Agreement;

(llllll)  increase in any manner the compensation of, or enter into or amend any employment, bonus, incentive, severance, consulting, or other compensation agreement with, any existing director, officer or employee of the Business;

(mmmmmm)   amend or modify any Employee Benefit Plan;

(nnnnnn)     amend, modify, extend, renew (other than automatically under the terms of a Lease) or terminate any Lease or enter into any new lease, sublease, license or other agreement for the use or occupancy of any real property;

(oooooo)     have any "going out of business," "store closing," "liquidation" or similar sale at any location except as set forth on <u>Schedule 5.7(h)</u>.

(pppppp)     enter into any promotion or discount program or arrangement that extends beyond the Closing Date; or

(qqqqqq)     agree to take any action prohibited by this Section 5.7.

1)     Further Assurances.  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Buyer's reasonable request and without further consideration, Seller will execute and deliver to Buyer such other instruments of sale, transfer, conveyance and assignment, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Purchased Assets, and, to the full extent permitted by law, to put Buyer in actual possession and operating control of the Purchased Assets and to assist Buyer in exercising and perfecting all rights with respect thereto, and otherwise to cause Seller to fulfill its obligations under this Agreement.

2)     Financial Statements.

(rrrrrr) Within fourteen (14) days of the date of this Agreement, Seller shall prepare and deliver to Buyer monthly unaudited statements of cash flows of the Business for the four months ended May 31, 2009 (the "<u>Cash Flow Statement</u>").  Such statement shall be prepared in accordance with GAAP, shall be true and correct in all material respects and fairly present, in all material respects, the cash flows of the Business for the period then ended.

(ssssss)     From and after the date hereof until the Closing, Seller shall, as soon as practicable and in any event within thirty (30) days after the end of each fiscal month of the Business, deliver to Buyer the unaudited balance sheet of the Business and the related statements of income and cash flows for the fiscal month and for the period from the beginning of the then current fiscal year to the end of such fiscal month.  Such statements shall be prepared in accordance with

GAAP, shall be true and correct in all material respects and fairly present, in all material respects, the financial condition, results of operation and cash flows of the Business for the period then ended.

      1)      Access to Information; Confidentiality.

(tttttt)  From the date hereof until the Closing, upon reasonable notice, Seller will cause each of Seller's representatives and Affiliates to: (i) afford the officers, employees, agents, consultants, accountants, potential financing sources, and other representatives of Buyer reasonable access, during normal business hours, to the offices, properties, books and records of Seller and its Affiliates relating to the Business and (ii) furnish to the officers, employees, agents, consultants, accountants, potential financing sources and other representatives of Buyer such additional financial and operating data and other information regarding the Purchased Assets and the Business as Buyer may from time to time reasonably request; provided, however, that such investigation will not unreasonably interfere with any of the businesses or operations of Seller or its Affiliates.

(uuuuuu)      Buyer will treat, and will cause its representatives and Affiliates to treat, all non-public information concerning Seller furnished to or reviewed by Buyer or its representatives or Affiliates in connection with the transactions contemplated by this Agreement in accordance with any confidentiality agreement entered into by the Parties (or their Affiliates) prior to the date of this Agreement in connection with Seller's offer to sell the Business (each a "<u>Confidentiality Agreement</u>"). Upon the consummation of the transactions contemplated hereby, any Confidentiality Agreement restricting Buyer's ability to disclose information related to the Business will terminate and be of no further force or effect.

      1)      Post-Closing Confidentiality.

(vvvvvv)      After the Closing, Seller will, and will cause its representatives and Affiliates to, treat as confidential and not disclose or use any and all non-public information that is not generally available to the public which Seller or any of its representatives or Affiliates has concerning the Business and the Purchased Assets. Notwithstanding the foregoing, Seller may disclose such confidential information (i) if it is advised by its counsel that it is required to disclose the same by judicial or administrative process or by other requirements of law or it is requested to do so by a Governmental Authority; provided, however, that, to the extent practicable, Seller will notify Buyer of such obligation to disclose confidential information at least five Business Days prior to such disclosure and will use its reasonable best efforts to narrow or limit to the extent possible the scope of such disclosure or (ii) in any proceeding brought by a Party in pursuit of its rights or in the exercise of its remedies under this Agreement.

(wwwwww)    After the Closing, Buyer will, and will cause its representatives and Affiliates to, treat as confidential and not disclose or use any and all information that is not generally available to the public (i) which Buyer or any of its representatives or Affiliates has concerning Seller and (ii) which is not in any way a part of, related to, or used in the Business or the

Purchased Assets. Notwithstanding the foregoing, Buyer may disclose such confidential information (x) if it is advised by its counsel that it is required to disclose the same by judicial or administrative process or by other requirements of law or it is requested to do so by a Governmental Authority; provided, however, that Buyer will, to the extent practicable, notify Seller of such obligation to disclose confidential information at least five Business Days prior to such disclosure and will use its reasonable best efforts to narrow or limit to the extent possible the scope of such disclosure or (y) in any proceeding brought by a Party in pursuit of its rights or in the exercise of its remedies under this Agreement.

1) **Public Announcements.** No Party shall issue any press release or public announcement relating to this Agreement or the transactions contemplated hereby without the prior written consent of the other Party (such consent not to be unreasonably withheld), except for such disclosures as are specifically contemplated hereby and such disclosures to such professional advisors as may be necessary or appropriate in order to consummate the transactions contemplated hereby, including the filing of this Agreement with the Bankruptcy Court promptly after the date hereof. The provisions of this Section 5.12 shall be subject to the Parties' obligations to comply with applicable requirements of law, including any order of the Bankruptcy Court, provided, however, that in the case of any disclosure required under law the disclosing Party shall, if practicable, provide the other Party reasonably advanced notice of, and opportunity to comment on, any such disclosure.

2) **Contract Amendments.** Seller shall use commercially reasonable efforts to assist Buyer in obtaining amendments to certain Contracts as requested by Buyer.

a.

CONDITIONS TO CLOSING

3) **Conditions to Obligations of Seller to Close.** The obligation of Seller, to effect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may be waived in whole or in part by Seller):

(xxxxxx) <u>Representations and Warranties.</u> The representations and warranties of Buyer under this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made on and as of the Closing Date, except that all representations and warranties which are qualified as to materiality will be true and correct in all respects.

(yyyyyy)    <u>Observance and Performance</u>.  Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date.

(zzzzzz)    <u>No Legal Actions</u>.  No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.  No Person shall have instituted a proceeding which shall not have been previously dismissed seeking to restrain, enjoin or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages with respect thereto.

(aaaaaaa)    <u>Sale Order</u>.  A final, non-appealable Sale Order shall have been entered by the Bankruptcy Court.

(bbbbbbb)    <u>Certificate</u>.  Buyer shall furnish to Seller a certificate duly signed by an authorized officer of Buyer to the effect that the conditions contained in Sections 6.1(a) and (b) have been satisfied, and that the resolution referenced in Section 6.1(f)(iii) is in full force and effect and has not been amended, altered or rescinded between the date of its adoption and the Closing Date.

(ccccccc)    <u>Closing Deliveries</u>.  At the Closing, Buyer shall deliver the following to Seller:

(i)    the Purchase Price by wire of immediately available funds to a bank account, which bank account shall be designated by Seller at least two (2) Business Days prior to the Closing (to the extent the Purchase Price exceeds the amount of DIP Financing);

(ii)    the Bill of Sale, duly executed by Buyer;

(iii)    a copy of the resolutions of the board of directors of Buyer approving this Agreement and the Related Agreements;

(iv)    a good standing certificate for Buyer, dated a recent date prior to the Closing Date and certified by the Secretary of State of Buyer's state of incorporation or organization; and

(v)    an incumbency certificate, dated the Closing Date, signed by a duly authorized officer of Buyer and giving the name and bearing a specimen signature of each individual who shall be authorized to sign, in the name and on behalf of Buyer, this Agreement and the Related Agreements.

1)    Conditions to Obligation of Buyer to Close.  The obligation of Buyer to effect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may, in Buyer's sole discretion, be waived in whole or in part):

(ddddddd)    <u>Representations and Warranties</u>.  The representations and warranties of Seller under this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made on and as of the Closing Date, except that all representations and warranties which are qualified as to materiality and/or Material Adverse Effect shall be true and correct in all respects.

(eeeeeee)    <u>Observance and Performance</u>.  Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date.

(fffffff)<u>No Legal Actions</u>.  No Governmental Authority shall have issued an order not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.  No Person shall have commenced an investigation or instituted a proceeding which shall not have been previously dismissed seeking to restrain, enjoin or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages with respect thereto.

(ggggggg)    <u>Governmental Approvals</u>. Seller shall have received all Seller Governmental Approvals in a form reasonably satisfactory to Buyer, and Buyer shall have received a copy of each such Seller Governmental Approval, and Buyer shall have received all Buyer Governmental Approvals in a form reasonably satisfactory to Buyer and Seller shall have received a copy of each such Buyer Governmental Approval.

(hhhhhhh)    <u>Assumed Contracts.</u>  Seller shall have assumed all Assumed Contracts and paid all Cure Costs with respect thereto.

(iiiiiii) <u>Necessary Consents.</u>  Seller shall have obtained all Necessary Consents not eliminated by the Assignment Order, in a form reasonably satisfactory to Buyer, and Buyer shall have received a copy of each such Necessary Consent.

(jjjjjjj) <u>Contract Amendments</u>.  Certain Contracts shall have been amended pursuant to Section 5.13 above prior to entry of the Sale Order on such terms and conditions as are acceptable to Buyer in its reasonable judgment.

(kkkkkkk)    <u>No Discount Obligations</u>.  There shall be no outstanding programs, arrangements or commitments still in effect at Closing (regardless of whether legally enforceable) entitling any Person to purchase Inventory at a discount or to receive free Inventory (including any "two for one," volume purchase or other such arrangements).

(lllllll)  <u>Certain Assets</u>.

(i)    The Inventory at Closing (less appropriate reserves for slow moving, obsolete or unsalable items) shall be not less than $4,000,000;

(ii)     The Accounts Receivable at Closing (less an appropriate reserve for doubtful accounts) shall be not less than $460,000; and

(iii)     The net book value of Fixtures and Equipment at Closing shall be not less than $1,850,000.

(mmmmmmm)     <u>Gift Card Liability</u>.  The Gift Card Liability at Closing shall not exceed the Accounts Receivable at Closing (less an appropriate reserve for doubtful accounts).

(nnnnnnn)     <u>Certificate</u>.  Seller shall furnish to Buyer a certificate duly signed by an authorized officer of Seller to the effect that the conditions contained in Sections 6.2(a) and (b) have been satisfied, and that the resolution referenced in Section 6.2(i)(iii) is in full force and effect and has not been amended, altered or rescinded between the date of its adoption and the Closing Date.

(ooooooo)     <u>FIRPTA Certificate</u>.  Seller will have furnished to Buyer on or before the Closing Date a certificate of non-foreign status in form and substance as required by Section 1445 of the IRC and the regulations thereunder.

(ppppppp)     <u>No Material Adverse Effect</u>.  There shall not have been any Material Adverse Effect since the date hereof.

(qqqqqqq)     <u>Due Diligence</u>.  Buyer shall have completed its due diligence review of the following items within a mutually agreed time frame, with results satisfactory to Buyer in its sole and complete discretion:

(i)     the Cash Flow Statement;

(ii)      all Books and Records;

(iii)     all Employee Benefit Plans;

(iv)     transfer Tax liability; and

(v)     all Contracts and Leases.

(rrrrrrr)<u>Management</u>.  All members of Seller's senior management to whom Buyer makes offers of employment shall have accepted such offers.

(sssssss)     <u>Permits</u>.  Buyer and its Affiliates shall have obtained permission, in form reasonably acceptable to Buyer, from all applicable Governmental Authorities to use the all Permits necessary in connection with the operation of the Business and/or the Purchased Assets.

(ttttttt) <u>Closing Deliveries</u>. At the Closing, Seller shall deliver the following to Buyer:

(i)     the Bill of Sale duly executed by  Seller;

(ii)     a good standing certificate for Seller, dated a recent date prior to the Closing Date and certified by the Secretary of State of Seller's state of organization;

(iii)     a copy of the resolutions of the board of directors of Seller approving this Agreement and the Related Agreements;

(iv)     an incumbency certificate, dated the Closing Date, signed by a duly authorized officer of Seller and giving the name and bearing a specimen signature of each individual who shall be authorized to sign, in the name and on behalf Seller, this Agreement and the Related Agreements; and

(v)     all other documents and instruments reasonably requested by Buyer to effect the transactions contemplated by this Agreement.

(uuuuuu)     <u>Bankruptcy Conditions</u>.  The Bankruptcy Court shall have entered and approved the Bid Procedures Order, the Sale Order and the Assignment Order in form and substance satisfactory to Buyer, and all such orders shall have become final orders.

a.

## BANKRUPTCY MATTERS

2)     Section 363 Covenants and Milestones.  Seller covenants and agrees that:

(vvvvvvv)     Seller will promptly file with the Bankruptcy Court, within five (5) Business Days of the commencement of the Chapter 11 Case, motions and supporting papers to approve the Bid Procedures Order, the Sale Order and the Assignment Order, which motions and supporting papers shall be in form and substance reasonably satisfactory to Buyer;

(wwwwwww) Seller will take such actions as are reasonably necessary to obtain entry of (i) the Bid Procedures Order no later than 20 days after the commencement of the Chapter 11 Case, (ii)  the Sale Order no later than 60 days after the commencement of the Chapter 11 Case, and (iii) the Assignment Order and a finding of adequate assurance of future performance by the Buyer;

(xxxxxxx)     Seller will take all necessary actions related to the sale process required by the Bid Procedures Order; and

(yyyyyyy)     Ten (10) days prior to the hearing to approve the sale, Seller shall circulate a notice to all counter-parties to Assumed Contracts (as well as such other parties as Buyer shall have reasonably designated prior to such date) setting forth the proposed Cure Amount due under such Assumed Contract (each a "<u>Cure Notice</u>").

1)      Bankruptcy Covenants.  Seller shall comply (or obtain an order from the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the purchase and sale of the Purchased Assets under this Agreement, and the assumption and assignment by Seller to Buyer of the Assumed Contracts (whether pursuant to the Bid Procedures Order or otherwise).  Notice of the hearing or a motion to issue the Sale Order, the Sale Order and the objection deadline relating thereto shall be served by Seller in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Courts, as applicable, on all Persons required to receive notice in the Chapter 11 Case under such rules, including, but not limited to, all Persons that have asserted Liens, encumbrances or other interests in the Purchased Assets, all non-Seller parties to all assumed Contracts and other contracts included in the Purchased Assets, counsel to the Creditors' Committee, the Office of the United States Trustee, and each of the Seller's known creditors, including by way of publication in the Wall Street Journal National Edition at Seller's expense, in form and substance reasonably satisfactory to Buyer.

a.

TERMINATION

2)      Termination.  This Agreement may be terminated at any time before the Closing:

(zzzzzzz)        by mutual written agreement of Buyer and Seller;

(aaaaaaaa)        by either Buyer or Seller, upon written notice to the other Party, if any Governmental Authority shall have issued an order, decree or ruling or initiated an investigation or taken any other action seeking to restrain, enjoin or otherwise prohibit the transactions contemplated hereby;

(bbbbbbbb)        by Buyer, upon written notice to Seller, if a motion to dismiss the Chapter 11 Case or a motion to convert the Chapter 11 Case or the appointment of a trustee, receiver, liquidator or other similar person for the purpose of liquidating any of the Purchased Assets other than pursuant to this Agreement has been approved by the Court with respect to the Chapter 11 Case;

(cccccccc)        by Buyer if a material breach of any provision of this Agreement has been committed by Seller and, if capable of cure, such breach has not been cured by Seller within fifteen (15) days after written notice from Buyer;

(dddddddd)        by Seller if a material breach of any provision of this Agreement has been committed by Buyer and, if capable of cure, such breach has not been cured by Buyer within fifteen (15) days after written notice from Seller;

(eeeeeee) by Buyer if satisfaction of any condition in Section 6.2 above is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement), including without limitation Buyer's determination under Section 6.2(m) above that the results of its due diligence review of Seller, the Purchased Assets and the Business are not satisfactory;

(fffffff) by Seller if satisfaction of any condition in 6.1 above is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement);

(ggggggg) by either Buyer or Seller after 5:00 p.m. (Eastern) on August 31, 2009, if the Closing has not occurred by such date (unless the Party seeking to terminate is then in material breach of its obligations under this Agreement), unless Buyer is selected as the Back-Up Bidder, in which case by either Buyer or Seller after 5:00 p.m. (Eastern) on September 30, 2009 (unless the Party seeking to terminate is in material breach of its obligations under this Agreement) if the Closing has not occurred by such date;

(hhhhhhh) by Buyer, upon written notice to Seller, if (i) the Bankruptcy Court shall not have entered the Bid Procedures Order on or before June 30, 2009, (ii) the Bankruptcy Court shall not have entered the Sale Order and the Assignment Order on or before August 8, 2009, (iii) the Bid Procedures Order shall not have become a final order on or before July 11, 2009, or (iv) the Sale Order and the Assignment Order shall not have become a final order on or before August 19, 2009; or

(iiiiiii) by Buyer or Seller, upon written notice to the other Party, if Seller (i) consents to or enters into an agreement to effect an Alternative Transaction and Buyer is not selected as the Back-Up Bidder; (ii) selects a Person other than Buyer as the Prevailing Bidder (as such term is defined in the Bid Procedures Order) and Buyer is not selected as the Back-Up Bidder; (iii) consummates an Alternative Transaction; or (iv) files a plan of reorganization which shall be funded by an Alternative Transaction.

1) Remedies; Break-Up Fee and Expense Reimbursement.

Upon termination of this Agreement pursuant to Section 8.1, except for Sections 5.10 and 5.12 and Articles 8 and 9, which shall survive to the fullest extent permitted by law, this Agreement shall be void and of no further effect, and neither Buyer nor Seller shall have any liability by reason of this Agreement or the termination thereof, provided that if such termination results from a Party's breach of a representation, warranty, covenant or other provision hereunder, the

non-breaching Party shall have all remedies available to it under this Agreement (with respect to all such breaches which occurred prior to the termination of this Agreement) at law, in equity or otherwise. Notwithstanding the foregoing or any other provision contained in this Agreement:

(jjjjjjjjj) From and after entry of the Bid Procedures Order, if this Agreement is terminated due to a breach or default hereunder by Seller, then, in addition to any other remedies available, Buyer shall immediately become entitled to receive Expense Reimbursement and the Break-Up Fee.

(kkkkkkkk) From and after entry of the Bid Procedures Order, if Seller consummates an Alternative Transaction or a sale of all or substantially all of its assets to a Prevailing Bidder (as such term is defined in the Bid Procedures Order) other than Buyer, then, if Buyer is not then in material breach of this Agreement, Buyer shall immediately become entitled to receive $50,000 (the "Break-Up Fee") and Expense Reimbursement. Seller shall be required to pay the Expense Reimbursement by wire of immediately available funds on the Business Day next following consummation of such Alternative Transaction or sale.

(llllllll) If Buyer becomes entitled to receive the Break-Up Fee and/or Expense Reimbursement, as applicable, then Buyer shall be granted an allowed superpriority administrative claim in an amount equal to the Break-Up Fee and/or Expense Reimbursement, as applicable (the "Superpriority Claim"), pursuant to sections 105, 503, 507(b) and 364(c)(1) of the Bankruptcy Code. The Superpriority Claim shall be superior and senior, in right of payment and all other respects, to any and all claims of any creditors of or holders of equity interests in Seller, any and all administrative expense claims, any and all superpriority administrative expense claims and any and all secured claims. Any Encumbrances (as such term is defined in the Bid Procedures Order) that attach to the cash proceeds of any Alternative Transaction shall be subject to and junior, in right of payment and all other respects, to Buyer's right to recover the Break-Up Fee and/or Expense Reimbursement, as applicable.

(mmmmmmmm) In addition to any other remedies set forth herein, in the event of a breach or default by either Party under this Agreement after entry of the Sale Order by the Bankruptcy Court, the other Party shall be entitled to all of its remedies at law and in equity.

(nnnnnnnn) If Seller selects a party other than Buyer as the Prevailing Bidder (as such term is defined in the Bid Procedures Order), and Buyer's bid (at the time of selection of the Successful Bidder) is the second highest bid, then Buyer agrees to serve as a back-up bidder (the "Back-Up Bidder") and keep its bid (at the time of selection of the Successful Bidder) in place as a back-up bid (the "Back-Up Bid"), through 5:00 p.m. (Eastern) on September 30, 2009, subject to Buyer's right to terminate this Agreement or the Back-Up Bid pursuant to Section 8.1 above or

pursuant to any additional terms and conditions as may be agreed to by the Parties at the auction. If Seller does not notify Buyer that its Back-Up Bid has been selected as the Successful Bidder by 5:00 p.m. (Eastern) on August 31, 2009, then this Agreement and the Back-Up Bid shall be deemed to be null and void and of no further effect, except to the extent this Agreement or the Back-Up Bid provides that its terms and conditions shall survive termination. Alternatively, if Seller notifies Buyer that its Back-Up Bid has been selected as the Successful Bid by 5:00 p.m. (Eastern) on August 31, 2009, then Buyer and Seller shall proceed to consummate the Back-Up Bid, subject to Buyer's right to terminate this Agreement or the Back-Up Bid pursuant to Section 8.1 above or pursuant to any additional terms and conditions as may be agreed to by the Parties at the auction.

(oooooooo) "Expense Reimbursement" means the amount in cash equal to the total amount of all reasonable out-of-pocket fees, costs and expenses incurred by Buyer and its Affiliates, not to exceed $50,000, in connection with the investigation, preparation, execution and performance of this Agreement, the Related Agreements and the transactions contemplated hereby and thereby, including without limitation all filing and notification fees, and all fees and expenses of Buyer's representatives (including, without limitation, attorneys and accountants), advisors and agents in connection therewith.

1) Extension; Waiver. At any time prior to the Closing, Seller, on the one hand, or Buyer, on the other hand, may (i) extend the time for performance of any of the obligations or acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, (iii) waive compliance with any of the agreements of the other Party contained herein, or (iv) waive any condition to its obligations hereunder. Any agreement on the part of Seller, on the one hand, or Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in writing.

a.

MISCELLANEOUS

2)      Expenses.    Except as specifically set forth in this Agreement or any Related Agreement, the Parties shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement, the Related Agreements, and the transactions contemplated hereby and thereby.  In any action or proceeding commenced in by reason of a breach of this Agreement or any Related Agreement, the prevailing Party therein shall be entitled to an award of its reasonable attorneys' fees and costs.

3)      Notices.    All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (b) transmitted by hand delivery, (c) sent by facsimile, (d) sent by nationally recognized overnight courier for next Business Day delivery, addressed as follows or (e) sent by electronic mail:

(pppppppp)    If to Seller:

Berean Christian Stores, LLC
9145 Meridian Way
West Chester, Ohio  45069
Attention:  Bill Simmons
Telephone:  (513) 728-6965
Facsimile:  (513) 728-6974
Email:  bsimmons@berean.com

with a copy (which shall not constitute notice) to:

Dinsmore & Shohl LLP
Attention:  Kasey T. Ingram, Esq.
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
Email:  kasey.ingram@dinslaw.com

(qqqqqqqq)    If to Buyer:

Berean Christian Stores Endeavor, LLC
PO Box 1660
Hollister, California,  95024
Attention:  Deanna and Joseph Gimelli
Telephone:  (831) 636-1220
Facsimile: (831) 636-3819
Email: 'DandJ@goeaglenet.com'


with copies (which shall not constitute notice) to:

Page Olson Commercial & Business Brokerage
11232  El Camino Real  Suite 150
San Diego, California 92130
Attention:  George Arapage, President
Telephone: 858 314-1300
Facsimile: 858 314-1301
Email: garapage@san.rr.com

and

Frost Brown Todd LLC
2200 PNC Center, 201 E. Fifth Street
Cincinnati, Ohio  45202
Attention:  Ronald E. Gold, Esq.
Telephone:  (513) 651-6156
Facsimile:  (513) 651-6981
Email:  rgold@fbtlaw.com

or, in each case, such other address as may be specified in writing to the other Party.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (v) if by first-class, registered or certified mail, on the fifth Business Day after the mailing thereof, (w) if by hand delivery, then immediately upon such delivery, (x) if by facsimile, then upon the date and time of the transmission of such facsimile, (y) if by nationally recognized overnight courier, on the next Business Day after deposit with such courier and (z) if sent by electronic mail, upon confirmation of receipt by the addressee.

1)      Amendment; Waivers, Etc.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

2)      Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

3)      Assignment.  Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by either Party without the prior written consent of the other Party.  No permitted assignment of this Agreement by a Party will relieve the Party of any of its obligations under this Agreement.

4)      Parties in Interest.  This Agreement and the Related Agreements shall be binding upon and inure solely to the benefit of the Parties and their successors and permitted assigns, and nothing in this Agreement or any Related Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement or any Related Agreement.

5)      Counterparts; Facsimile Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties.  Any Party may execute this Agreement by facsimile signature and the other Parties will be entitled to rely upon such facsimile signature as conclusive evidence that this Agreement has been duly executed by such Party.  Any Party may deliver such counterparts by facsimile transmission or by electronic mail in portable document format (.pdf) or tagged image file format (.tif).

6)      Governing Law.  Except to the extent inconsistent with the Bankruptcy Code, this Agreement and the Related Agreements shall be governed by and construed and enforced in accordance with the laws of the State of Ohio, without regard to its conflicts of law rules.

7)      Jurisdiction.  At any time prior to the conclusion of the Chapter 11 Case, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.  At any time after the conclusion of the Chapter 11 Case, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the United States District Court for the Southern District of Ohio, and such court shall have exclusive jurisdiction over any such proceeding.  Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Related Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Related Agreement.

8)      Severability.  If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of

rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever, so long as this Agreement, taken as a whole, still expresses the material intent of the Parties.  The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

9)      Entire Agreement.  This Agreement and the Related Agreements constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.  There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

10)      Employees Not Third-Party Beneficiaries.  Nothing in this Agreement or the Related Agreements is intended to confer upon any past, present or future employee of Seller or its Affiliates or his or her legal representatives or heirs any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement or by the Related Agreements, including, without limitation, any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

11)      Survival of Representations and Warranties.  None of the representations or warranties of Seller or Buyer set forth in this Agreement, any Related Agreement, or in any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.

12)      Schedules.  Any matter disclosed in any schedule to this Agreement shall be deemed to have been disclosed in each other schedule to this Agreement so long as the matter is disclosed on the applicable schedule in sufficient detail to make it apparent to Buyer that such disclosure is relevant to such other schedule.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT
DATED AS OF JUNE 8, 2009]

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered as of the date first above written.

SELLER:                                    BEREAN CHRISTIAN STORES, LLC

                                           By:
                                           Name:
                                           Title:


BUYER:                                     BEREAN CHRISTIAN STORES
                                              ENDEAVOR, LLC

                                           By:
                                           Name:
                                           Title:

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered as of the date first above written.

SELLER:

BEREAN CHRISTIAN STORES, LLC

By: _David W. Simmons III_

Name:  David William Simmons III
Title:  President and CEO

BUYER:

BEREAN CHRISTIAN STORES
  ENDEAVOR, LLC

By: _____
Name:
Title:

EXECUTION COPY

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT
DATED AS OF JUNE 8, 2009]

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered as of the date first above written.

SELLER:                              BEREAN CHRISTIAN STORES, LLC

                                     By:
                                     Name:
                                     Title:


BUYER:                               BEREAN CHRISTIAN STORES
                                        ENDEAVOR, LLC

                                     By: _Joseph A. Gimelli_
                                     Name: Joseph A. Gimelli
                                     Title: President, CEO

40

**EXECUTION COPY**

Exhibit A - Bid Procedures Order

Exhibit B - Bill of Sale

Exhibit C – Sale Order

# EXHIBIT B

# BID PROCEDURES

**BID PROCEDURES**

Set forth below are the bid procedures (the "Bid Procedures") to be employed by Berean Christian Stores, LLC (the "Debtor") in connection with that certain asset purchase agreement between the Debtor and Berean Christian Stores Endeavor, LLC, a California limited liability company (the "Purchaser"), pursuant to which the Purchaser shall acquire all or substantially all of the Debtor's assets on the terms and conditions specified therein (the "Purchase Agreement"). The Debtor shall obtain entry of an order, in form and substance acceptable to the Purchaser, of the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court") which, among other things (a) approves the Bid Procedures, (b) approves the form and manner of the Sale Notice and Bid Procedures Notice, (c) schedules a Sales Hearing date, (d) approves procedures for the assumption and assignment of executory contracts and unexpired leases, and (e) approves the break-up fee and expense reimbursement (the "Bid Procedures Order"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

1.      **Assets to be Sold**

The Debtor shall offer for sale all or substantially all of the property and assets (the "Asset Sale") of the Debtor's business as identified in further detail in the Purchase Agreement (collectively the "Acquired Property").

2.      **Participation Requirements**

Any person that wishes to participate in the bid process (each, a "Potential Bidder") must become a "Qualifying Bidder." As a prerequisite to becoming a Qualifying Bidder (and, thus, being able to conduct due diligence), a Potential Bidder must be able, as determined by the Debtor, to consummate a transaction based upon the Asset Sale, if selected as the successful bidder.

The Purchaser is deemed a Qualifying Bidder and the Purchase Agreement constitutes a Qualifying Bid (as defined below) for all purposes.

3.      **Due Diligence**

The Debtor shall afford any Qualifying Bidder that delivers an executed confidentiality agreement in form and substance acceptable to the Debtor and Trustee, the time and opportunity to conduct reasonable due diligence, subject to parameters that the Debtor, in consultation with its advisors, deem appropriate. The due diligence period shall extend through and include the Bid Deadline (as defined below). The Debtor and its representatives shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

4.      **Bid Requirements**

To be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder by a date no later than the Bid Deadline that:

a)      states such Qualifying Bidder offers to purchase all or substantially all of the assets of the Debtor, (the "Assets") upon the terms and conditions substantially as set forth

in the Purchase Agreement or pursuant to an alternative structure that the Debtor determines is no less favorable than the terms and conditions of the Purchase Agreement;

b)    is accompanied by a clean and duly executed purchase agreement (the "Modified Purchase Agreement") and a marked Modified Purchase Agreement reflecting any variations from the Purchase Agreement executed by the Purchaser;

c)    states such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement and provides written evidence in support thereof;

d)    states such Qualifying Bidder's offer is irrevocable until the closing of the Asset Sale if such Qualifying Bidder is the Prevailing Purchaser or Back-Up Bid (each as defined below);

e)    contains such financial and other information to allow the Debtor, in consultation with its advisors, to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including, without limitation, such financial and other information setting forth adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code in a form requested by the Debtor;

f)    identifies with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;

g)    does not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement, or similar type of payment;

h)    fully discloses the identity of each entity that will be bidding in the Asset Sale or otherwise participating in connection with such bid (including the parent company of any entity formed to participate in the Asset Sale), and the complete terms of any such participation;

i)    will result in value to the Debtor's estate, in the Debtor's reasonable judgment after consulting with legal and financial advisors, that is more than the aggregate of the value of the sum of: (i) $1,600,000 (the initial purchase price) plus (ii) $160,000, which amount shall be the "Initial Overbid" (inclusive of the Bid Protections);

j)    provides for the repayment of all obligations owed by the Debtor under the post-petition debtor-in-possession financing facility by the date upon which the transaction contemplated under the Modified Purchase Agreement is substantially consummated;

k)    (i) does not contain any due diligence or financing contingencies of any kind; and (ii) contains evidence that the Qualifying Bidder has received debt and/or equity funding

commitments or has financial resources readily available sufficient in the aggregate to consummate the Asset Sale, which evidence is reasonably satisfactory to the Debtor;

l)      includes evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Purchase Agreement; and

m)      provides a purchase deposit equal to ten percent (10%) of the purchase price contained in the Modified Purchase Agreement.

A competing bid satisfying all the above requirements shall constitute a Qualifying Bid.

**5.      Bid Deadline**

A Qualifying Bidder that desires to make a bid shall deliver a written or electronic copy of its bid to (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons) and (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor so as to be received no later than July 16, 2009 at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline").

**6.      Evaluation of Qualifying Bids**

The Debtor shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be qualified by a date no later one (1) days prior to the Auction Date (as defined below). Prior to the Auction (as defined below), the Debtor shall determine, in its reasonable judgment, which of the Qualifying Bids is the highest or best value to the Debtor. Upon making a determination that a bidder has submitted a Qualifying Bid, the Debtor shall promptly notify the Purchaser of the identity of the proposed Qualifying Bidder and provide the Purchaser with a copy of the Qualifying Bid.

**7.      No Qualifying Bids**

If no timely, conforming Qualifying Bids other than the Purchase Agreement submitted by the Purchaser are submitted by the end of the Bid Deadline, the Debtor shall not hold an Auction and instead shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the Purchase Agreement with the Purchaser.

**8.      Auction**

In the event that the Debtor timely receives one or more Qualifying Bids other than the Purchase Agreement, the Debtor shall conduct an auction (the "Auction") on a date and at a location to be determined by the Debtor, which shall occur no later than July 22, 2009 (the "Auction Date"). The Auction shall be governed by the following procedures:

(a)    only the Purchaser and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(b)    the Purchaser and the other Qualifying Bidders shall appear in person or by other means, including telephonically, as may be permitted by the Debtor at the Auction, or through a duly authorized representative;

(c)    bidding shall commence at the amount of the highest Qualifying Bid submitted by a Qualifying Bidder prior to the Auction;

(d)    Qualifying Bidders may then submit successive bids in minimum increments, to be determined in the sole discretion of the Debtor, and then continue in such increments; provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(e)    the Purchaser shall be entitled to include as part of any and all of its subsequent bids a credit for the amount of the Break-Up Fee and the Expense Reimbursement (each as defined in the Purchase Agreement);

(f)    all Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction, provided that any such modifications to the Purchase Agreement or Modified Purchase Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtor than the terms of the Purchase Agreement;

(g)    the Auction shall continue until there is only one offer that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best from among the Qualifying Bids submitted at the Auction (the "Prevailing Bid"); and the second highest or best from among the Qualifying Bids submitted at the Auction, as determined by the Debtor, shall be the "Back-Up Bid".  In making this decision, the Debtor shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate.  The bidder submitting such Prevailing Bid shall become the "Prevailing Purchaser," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Purchase Agreement or Modified Purchase Agreement, as applicable.  The bidder submitting such Back-Up Bid shall become the Back-Up Bidder and in the event the Prevailing Purchaser fails to close shall be required to close under the terms of the Purchase Agreement or Modified Purchase Agreement signed by such Back-Up Bidder;

(h)    within one (1) business day after adjournment of the Auction, the Prevailing Purchaser shall complete and execute all agreements, contracts, instruments and

other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made; and

(i)    within one (1) day after adjournment of the Auction, the Debtor shall file a notice identifying the Prevailing Purchaser and Back-Up Bidder with the Bankruptcy Court.

**9.    <u>Sale Hearing</u>**

The Prevailing Bid (or the Purchase Agreement if no Qualifying Bid other than that of the Purchaser is received) and Back-Up Bid will be subject to approval by the Bankruptcy Court. The hearing to approve the Prevailing Bid (or the Purchase Agreement if no Qualifying Bid other than that of the Purchaser is received) (the "Sale Hearing") shall take place on or before July 27, 2009.

**10.    <u>The Back-Up Bid</u>**

In the event the Prevailing Purchaser is unable to consummate the Asset Sale following the Sale Hearing, the Debtor will have the right to present any other bid, including the Back-Up Bid, to the Court for approval.

**11.    <u>Return of Deposits</u>**

All deposits shall be returned to each bidder not selected by the Debtor as the Prevailing Purchaser or Back-Up Bidder by no later than five (5) business days following the conclusion of the Auction. The Deposit to the Prevailing Purchaser or Back-Up Bidder shall be returned to the party that does not close the transaction, if due and owing, no later than five (5) business days following the closing of the Asset Sale.

**12.    <u>Reservation of Rights</u>**

The Debtor reserves the right to extend the deadlines set forth in the Bid Procedures and/ or to adjourn the Auction for cause shown upon notice and with the consent of the Purchaser.

## EXHIBIT C

## NOTICE OF AUCTION AND SALE HEARING

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **BEREAN CHRISTIAN STORES, LLC**<br>**9415 Meridian Way**<br>**West Chester, OH 45069** | **Case No. 09-13640** |
| **a Delaware limited liability company,** | **Honorable Jeffery P. Hopkins** |
| **Debtor** | |
| **Employer Tax I.D. No.  20-4890647** | |

## NOTICE OF AUCTION AND SALE HEARING IN CONNECTION WITH THE SALE OF  ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF <u>BEREAN CHRISTIAN STORES, LLC</u>

Notice is hereby given, as follows:

1. On June 9, 2009, the above-captioned debtor (the "Debtor") filed a motion seeking approval of, among other things (i) Bid Procedures and Bid Protections in connection with a sale of all or substantially all of the Debtor's assets free and clear of any and all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code (an "Asset Sale"); (ii) procedures to determine cure amounts and deadlines for objections to certain contracts, and leases to be assumed and assigned by the Debtor pursuant to the Transaction; and (iii) related relief (the "Bid Procedures Motion") with the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court"). By order dated _____, 2009, the Bankruptcy Court approved the Bid Procedures and the Bid Procedures Motion (the "Bid Procedures Order").

2. The Debtor has agreed to a "Purchase Agreement" with the Purchaser[1] contemplating the sale by the Debtor of all or substantially all of its assets, which Purchase Agreement remains subject to higher and better offers from any prospective Qualifying Bidder.

3. All interested parties are invited to become a Qualifying Bidder and to make offers to purchase all or substantially all of the Debtor's assets, in accordance with the terms of the Bid Procedures and the Bid Procedures Order, available upon faxed, written request from counsel to the Debtor, Dinsmore & Shohl LLP, 255 E. 5th Street, Suite 1900, Cincinnati, Ohio 45202 (Attn: Kasey T. Ingram, Kim Martin Lewis, and Patrick D. Burns) (facsimile number (513) 977-8141) ("Debtor's Counsel"). The deadline to submit bids (the "Bid Deadline") is July 16, 2009 at 4:00 p.m. (prevailing Eastern Time).

---

[1] Capitalized terms not defined herein shall have the meaning ascribed in the Bid Procedures Order.

4. Pursuant to the Bid Procedures Order, the Debtor may conduct an auction (the "Auction") for the sale of the assets at the offices of Dinsmore & Shohl LLP, 255 E. 5th Street, Suite 1900, Cincinnati, Ohio 45202, on July 22, 2009 at 10:00 a.m. (prevailing Eastern Time), or at such other place and time as the Debtor shall notify all Qualifying Bidders.

5. The Debtor intends to seek the Bankruptcy Court's approval of the sale of all or substantially all of the Debtor's assets to the Purchaser, or to a Qualifying Bidder submitting the highest or best offer at the Auction (the "Prevailing Purchaser") or the next highest or best offer (the "Back-Up Bid" in the event the Prevailing Purchaser shall be unable to close the Asset Sale. A hearing will be conducted on or before July 27, 2009 at 2:00 p.m. (prevailing Eastern time), or such other time as the Bankruptcy Court shall determine (the "Sale Hearing"). The Sale Hearing will be held before the Honorable Jeffery P. Hopkins.

6. At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this chapter 11 case. Objections, if any, to the Asset Sale pursuant to the terms of the agreement reached between the Debtor and the Prevailing Purchaser shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of Ohio, shall set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtor's estate or properties, the basis for the objection and the specific grounds therefore, and shall be filed with the Bankruptcy Court and be served upon (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn: Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the DIP Term Lender and Proposed Buyer; (iv) Financial Resource Associates, Inc., 10901 Reed Hartman Hwy., Ste. 320, Cincinnati, OH 45242 (Attn: Leonard Z. Eppel (fralze@juno.com); (v) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (vi) holders of the 25 largest unsecured claims; and (vii) any governmental unit listed in LBR 5003-1(d) (collectively, the "Initial Master Service List"), so as to be actually received on or before July 24, 2009 at 4:00 p.m. (prevailing Eastern Time).

7. Requests for a copy of the Purchase Agreement or for any other information concerning the Transaction should be directed by written request to Debtor's counsel.

Dated: _____, 2009          Respectfully submitted,
    Cincinnati, Ohio

DINSMORE AND SHOHL, LIP

*/s/*_____
Kasey T. Ingram (OH# 0075234)
Kim Martin Lewis (OH#  0043533)
Patrick D. Burns (OH# 0081111)
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Telephone:  513-977-8200
Facsimile:  513-977-8141
kasey.ingram@dinslaw.com
kim.lewis@dinslaw.com
patrick.burns@dinslaw.com

Counsel for the Debtor and
 Debtor-in-Possession

# EXHIBIT D

## NOTICE OF ASSUMPTION OR REJECTION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **In re:**<br><br>**BEREAN CHRISTIAN STORES, LLC**<br>**9415 Meridian Way**<br>**West Chester, OH 45069**<br><br>**a Delaware limited liability company,**<br><br>**Debtor**<br><br><br>**Employer Tax I.D. No.  20-4890647** | **Chapter 11**<br><br>**Case No. 09-13640**<br><br>**Honorable Jeffery P. Hopkins** |

**NOTICE OF DEBTORS' INTENT TO REJECT OR TO
ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND
<u>EXECUTORY CONTRACTS AND SETTING FORTH THE CURE AMOUNTS</u>**

PLEASE TAKE NOTICE that on June 10, 2009, the debtor in the above-captioned case (the "Debtor"), filed a motion (the "Motion") (Doc. No. __) seeking approval of, among other things: (i) Bid Procedures and Bid Protections in connection with a sale of all or substantially all of the Debtor's assets free and clear of any and all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code (the "Sale"); (ii) establishing procedures to determine Cure Amounts and deadlines for objections to certain contracts, and leases to be assumed and assigned by the Debtor pursuant to the Sale (the "Cure Procedures") and (c) granting related relief with the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court").  By order dated _____, **2009**, a copy of which is annexed hereto as <u>Exhibit A</u>, the Bankruptcy Court approved the Motion and the Cure Procedures (the "Procedures Order").

PLEASE TAKE FURTHER NOTICE that at a hearing on July 27, 2009 at 2:00 p.m. (prevailing Eastern time) or such other time as the Bankruptcy Court shall determine (the "Sale Hearing"), the Debtor intends to seek approval of the Sale with the Purchaser or another successful

bidder at the Auction[2] (each, a "Buyer"), pursuant to the terms of a purchase agreement between the Debtor and the Buyer (the "Purchase Agreement").

PLEASE TAKE FURTHER NOTICE that, the Debtor is a party to various executory contracts and unexpired leases (the "Contracts and Leases"), and, pursuant to the Procedures Order, at the Sale Hearing, the Debtor intends to seek approval of the Bankruptcy Court to assume and assign to the Buyer certain Contracts and Leases (collectively, the "Assumed Contracts and Leases").

PLEASE TAKE FURTHER NOTICE that the Debtor intends to reject all Contracts and Leases that are not designated by the Buyer as Assumed Contracts and Leases (the "Rejected Contracts and Leases").

PLEASE TAKE FURTHER NOTICE that you have been identified as either a party to a Contract or Lease that the Debtor may seek to assume and assign or as a party to a Contract or Lease that the Debtor may seek to reject. The Contracts and Leases that may be assumed and assigned by the Debtor, and the corresponding proposed cure amounts (the "Cure Amounts"), are set forth on **Exhibit A** annexed hereto. The Contracts and Leases that the Debtors may seek to reject are set forth on **Exhibit B** annexed hereto.

PLEASE TAKE FURTHER NOTICE that the Debtor believes that any and all defaults (other than the filing of this chapter 11 case) and actual pecuniary losses under the Assumed Contracts and Leases can be cured by the payment of the Cure Amounts.

PLEASE TAKE FURTHER NOTICE that the assumption of any executory contract or unexpired lease shall result in the full release and satisfaction of any claims or defaults, whether monetary or non-monetary.

PLEASE TAKE FURTHER NOTICE that any objections to the proposed rejection of the Rejected Contracts and Leases or the proposed assumption and assignment of the Assumed

---

[2] Capitalized terms not defined herein shall have the meaning ascribed in the Bid Procedures Order.

Contracts and Leases (including, but not limited to, objections relating to the Cure Amount and/or adequate assurances of future performance, if applicable) must (a) be in writing; (b) state with specificity the nature of such objection and the alleged Cure Amount (with appropriate documentation in support thereof), if applicable; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court; and (d) be filed with the Court and served upon (so as to be received by) the following parties **no later than 4:00 p.m. on July 24, 2009 (prevailing Eastern time)** (the "Objection Deadline"):  (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn:  Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the DIP Term Lender and Proposed Buyer; (iv) Financial Resource Associates, Inc., 10901 Reed Hartman Hwy., Ste. 320, Cincinnati, OH 45242 (Attn:  Leonard Z. Eppel (fralze@juno.com); (v) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (vi) holders of the 25 largest unsecured claims; and (vii) any governmental unit listed in LBR 5003-1(d) (collectively, the "Initial Master Service List").  Unless the Objection is timely filed and served, the rejection or assumption and assignment of the applicable contracts and leases will proceed without further notice.

PLEASE TAKE FURTHER NOTICE that if no Cure Amount is due under the Assumed Contract, and the non-Debtor party to such agreement does not otherwise object to the Debtor's

assumption and assignment of such agreement, no further action need to be taken on the part of that non-Debtor party.

PLEASE TAKE FURTHER NOTICE that any person or entity receiving this notice that fails to file an Objection on a timely basis (a) shall be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtor, its estate, or the Buyer on account of the rejection or assumption and assignment of such executory contract or unexpired lease and deemed to have consented to the proposed rejection or assumption and assignment; and (b) upon approval by the Bankruptcy Court of the rejection or assumption and assignment to the Buyer of the Assumed or Rejected Contracts, shall be deemed to have waived any right to object, consent, condition or otherwise restrict any such assumption and assignment.

PLEASE TAKE FURTHER NOTICE that a hearing on Objections may be held (a) at the Sale Hearing, or (b) at such other date prior to or after the Sale Hearing as the Bankruptcy Court may designate upon request by the Debtor.

PLEASE TAKE FURTHER NOTICE that the Debtor's decision to reject or assume and assign the Assumed or Rejected Contracts is subject to Bankruptcy Court approval and consummation of the Sale. Absent consummation of the Sale, each Assumed or Rejected Contract shall not be deemed rejected, assumed or assigned and shall in all respects be subject to further administration under the Bankruptcy Code. The designation of any agreement as an Assumed or Rejected Contract shall not constitute or be deemed to be a determination or admission by the Debtor or the Buyer that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

PLEASE TAKE FURTHER NOTICE that Objections regarding the Cure Amount or the ability of the Debtor or Buyer to provide adequate assurance of future performance shall be conditioned upon resolution of such dispute (the "Dispute Resolution") by the Bankruptcy Court. The Debtor or Buyer reserves the right to either reject or nullify the assumption of an Assumed Contract that is subject to Dispute Resolution. Any payments required to be made based on such Objections shall be made as soon as reasonably practicable following the entry of a Final Order resolving such dispute.

PLEASE TAKE FURTHER NOTICE that Debtor reserves the right to remove any Assumed Contract from any proposed Asset Sale and to withdraw the request to assume and assign any such Assumed Contract.

Dated: _____, 2009
      Cincinnati, Ohio

Respectfully submitted,

DINSMORE AND SHOHL, LLP

_/s/_ _____
Kasey T. Ingram (OH# 0075234)
Kim Martin Lewis (OH#  0043533)
Patrick D. Burns (OH# 0081111)
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Telephone:  513-977-8200
Facsimile:  513-977-8141
kasey.ingram@dinslaw.com
kim.lewis@dinslaw.com
patrick.burns@dinslaw.com

Proposed Counsel for the Debtor and
  Debtor-in-Possession

# PROPOSED ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **BEREAN CHRISTIAN STORES, LLC**<br>**9415 Meridian Way**<br>**West Chester, OH 45069** | Case No. 09-13640 |
| a Delaware limited liability company, | Honorable Jeffery P. Hopkins |
| Debtor | |
| Employer Tax I.D. No. 20-4890647 | |

**ORDER PURSUANT TO SECTIONS 105, 363, 365, 1107 AND 1108 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 (A) APPROVING
PROCEDURES FOR CONSIDERATION OF ALTERNATIVE INVESTMENT OR SALE
PROPOSALS; (B) APPROVING THE BREAK-UP FEE AND EXPENSE
REIMBURSEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO APPROVE
THE TRANSACTION AND APPROVING THE FORM AND MANNER OF NOTICE
THEREOF; AND (D) ESTABLISHING PROCEDURES RELATING TO THE
ASSUMPTION AND/OR ASSIGNMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS</u>**

Upon the motion of the Debtor (Doc. No. _____) for an order (a) approving procedures for

consideration of alternative investment or sale proposals; (b) approving the Break-Up Fee and

Expense Reimbursement[3]; (c) scheduling an auction and hearing to approve the Transaction and approving the form and manner of notice thereof; and (d) establishing procedures relating to the rejection or assumption and/or assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Motion") dated [June ____, 2009;] and the Court having considered the Motion and objections thereto, if any, and the arguments of counsel made, and the evidence adduced, at a hearing on the Motion; notice of this Motion, as set forth in the Motion, having been appropriate under the circumstances; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors and all other interested parties; and after due deliberation thereon, and good cause appearing therefore,

**THE COURT HEREBY FINDS THAT:[4]**

(a)  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(b)  The statutory predicates for the relief requested in this Motion are sections 105(a), 363(b) and (f), 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

(c)  The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the sale process, including, without limitation, (i) approval of the Bid Procedures and, under the circumstances described herein, the Break- Up Fee and

---

[3] Capitalized terms not defined herein shall have the meanings given to them in the Motion.
[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Expense Reimbursement; (ii) determination of final Cure Amounts (as defined below) in the manner described herein; and (iii) approval and authorization to serve the Sale Notice (as defined below).

(d)     The Break-Up Fee and Expense Reimbursement to be paid under the circumstances described herein and in the Purchase Agreement to the Purchaser are: (i) actual and necessary costs and expenses of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by the Purchaser; (iii) reasonable and appropriate in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Purchaser; and (iv) necessary to induce the Purchaser to continue to pursue the Transaction and to continue to be bound by the terms of the Purchase Agreement.

(e)     The Break-Up Fee and Expense Reimbursement also induced the Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors and other bidders may rely.  The Purchaser has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for the Debtor's assets will be received.  Accordingly, the Bid Procedures, and the Expense Reimbursement are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate.  The priority of the Break-Up Fee and Expense Reimbursement shall be an administrative super-priority claim in the Chapter 11 Case and shall be made prior to the payment of any other claim in this Chapter 11 case, save for the post-petition loan claim of SANI PACIFIC.

(f)     The Bid Procedures and Purchase Agreement were negotiated in good faith by the Debtor and the Purchaser.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

The Bid Procedures, substantially in the form attached to the Motion as <u>Exhibit B</u>, are hereby approved and fully incorporated into this Order. The Debtor may modify the Bid Procedures if it deems such modifications to be in the best interest of the Debtor's estate, with such modifications being acceptable to the Purchaser and if not, then the Purchaser may withdraw its offer to purchase and terminate the Purchase Agreement. The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.

All objections, if any, to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

The Break-Up Fee and Expense Reimbursement, as set forth in the Purchase Agreement, are hereby approved. If the Purchaser becomes entitled to receive the Break-Up Fee and Expense Reimbursement, then the Purchaser shall be, and hereby is, granted an allowed administrative super-priority claim in the Debtor's chapter 11 case of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code junior only to the claims of the SANI PACIFIC, in an amount equal to the Break-Up Fee and Expense Reimbursement.

The Purchaser's aggregate liability for monetary damages in the event of the termination of the Purchase Agreement, if any, shall not exceed an amount equal to the Expense Reimbursement.

The Debtor is authorized and directed, without further action or order by the Court, to pay the Break-Up Fee and Expense Reimbursement to the Purchaser in accordance with the terms and conditions of the Purchase Agreement should it become due and payable.

No person or entity, other than the Purchaser, shall be entitled to any expense reimbursement, break-up fee, "topping," termination or other similar fee or payment.

The Notice of Auction and Sale Hearing (the "Sale Notice"), substantially in the form attached to the Motion as Exhibit C:  (a) is hereby approved; and (b) shall be served within five (5) business days of entry of this Order, upon (i) Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn: Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com) Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the Lender and the Purchaser; (iv) Financial Resource Associates, Inc., 10901 Reed Hartman Hwy., Ste. 320, Cincinnati, OH 45242 (Attn:  Leonard Z. Eppel (fralze@juno.com); (v) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); (vi) holders of the 25 largest unsecured claims; and (vii) any governmental unit listed in LBR 5003-1(d) (collectively, the "Initial Master Service List"); (viii) all creditors listed on the creditor matrix; (ix) all parties that have filed a Notice of Appearance in this case; (x) all parties known to Debtors who have, or may have asserted liens against any of Debtors' assets; (xi) all parties which have contracts or leases that may be subject to assumption or rejection in accordance with 11 U.S.C § 365; and (xii) all Potential Bidders known to the Debtor.

The Notice of Debtor's Intent to Reject or Assume and Assign Certain Unexpired Leases and Executory Contracts and Setting Forth Cure Amounts (the "Cure Notice"), substantially in the form attached to the Motion as Exhibit D: (a) is hereby approved; and (b) shall be served upon each

counterparty to and executory contract or unexpired lease no later than ten (10) days prior to the Sale Hearing.

Except as may otherwise be agreed to by the parties to an Assumed Contract (with the consent of the Prevailing Purchaser), the Cure Amount shall be paid in cash, by the Debtor, within two (2) days of the closing of the Transaction,  In the event of a dispute regarding the Cure Amount, any payments required, following entry of a Final Order resolving such dispute, shall be made as soon as practicable thereafter.

Objections, if any, to the proposed rejection or assumption and assignment of the Rejected or Assumed Contracts, including, but not limited to, objections relating to the Cure Amount, adequate assurances of future performance, and/or other objections pertaining to the assumption and/or assignment of the Rejected or Assumed Contracts must (a) be in writing; (b) state with specificity the nature of such objection and the alleged Cure Amount (with appropriate documentation in support thereof, if applicable); (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court; and (d) be filed with this Court and served upon (so as to be received by) the following parties (collectively, the "Notice Parties") on or before the Sale Objection Deadline (defined below): Berean Christian Stores, LLC, 9415 Meridian Way, West Chester, OH 45069 (Attn: William Simmons); (ii) Dinsmore & Shohl LLP, 255 East Fifth St., Suite 1900, Cincinnati, Ohio 45202 (Attn. Kasey T. Ingram, Esq. (kasey.ingram@dinslaw.com), Kim Martin Lewis, Esq. (kim.lewis@dinslaw.com), and Patrick D. Burns, Esq. (patrick.burns@dinslaw.com)), counsel to the Debtor; (iii) Frost Brown Todd LLC, 201 E. Fifth St., Suite 2200, Cincinnati, Ohio 45202 (Attn: Ronald E. Gold, Esq. (rgold@fbtlaw.com) counsel to the Lender and the Purchaser; (iv) the Office of the United States Trustee, Southern District of Ohio, 36 East Seventh St., Suite 2030, Cincinnati, OH 45202 (Attn: Monica Villarejos Kindt, Esq. (monica.kindt@usdoj.gov)); and

(v) any governmental unit listed in LBR 5003-1(d); and (vi) any party filing a Notice of Appearance in this Chapter 11 case.

Any party to a Rejected or Assumed Contract failing to timely file an objection to (i) the Cure Amounts as set forth in the Cure Notice, (ii) adequate assurance of future performance, or (iii) the proposed rejection or assumption and assignment of the Rejected or Assumed Contracts, shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtor, its estate, or the Prevailing Purchaser with respect to such party's executory contract(s) or unexpired lease(s) and will be deemed to consent to the Transaction and the proposed rejection or assumption and assignment of its executory contract(s) or unexpired lease(s).

Where a party to an Assumed Contract files a timely objection asserting a higher cure amount than the Cure Amount, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such objection will be determined at the Sale Hearing or such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of the Assumed Contracts will be heard at the Sale Hearing.

In the event the Debtor does not receive any Qualifying Bids except for the Qualifying Bid of the Purchaser by the Bid Deadline, the Debtor shall not hold an Auction and instead shall seek approval of the Purchase Agreement at the Sale Hearing.

In the event the Debtor receives more than one Qualifying Bid, the Debtor shall conduct the Auction on July 22, 2009 at 10:00 a.m. prevailing Eastern time at Dinsmore & Shohl LLP, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202. If the date or location of the Auction is changed, notice of the changed date or location will be filed with the Bankruptcy Court at least 24 hours prior to the scheduled commencement of the Auction.

The hearing to approve the Transaction will be conducted on July 27, 2009 at 2:00 p.m. prevailing Eastern time (the "Sale Hearing"). The Debtor will seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Transaction to the Purchaser or the bidder with the highest or best offer at the Auction, as applicable (the "Prevailing Purchaser"), on terms and conditions consistent with the Purchase Agreement or, as the case may be, the Modified Purchase Agreement, as each may be amended and modified. The Sale Hearing may be adjourned or rescheduled with consent of the Prevailing Purchaser, without notice other than by an announcement of the adjourned date at the Sale Hearing.

Objections, if any, to the relief requested in the Sale Motion as it relates to the Transaction must: (a) be in writing and filed with this Court; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; and (c) be served upon (so as to be received by) the Notice Parties on or before 4:00 p.m. prevailing Eastern time on July 24, 2009 (the "Sale Objection Deadline").

Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

This Court shall retain jurisdiction to resolve any dispute relating to the interpretation, implementation and enforcement of the terms and conditions of the Purchase Agreement and this

Order.  To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

**IT IS SO ORDERED.**

### #